655 P.2d 434

STATE of Idaho, Plaintiff-Respondent,

v.

Joseph Alexander CARTER,
Defendant-Appellant.

No. 13040.

Supreme Court of Idaho.

Sept. 10, 1981.

On Rehearing Dec. 20, 1982.

918

Michael E. Donnelly of Skinner, Donnelly, Fawcett & Mauk, Boise, for defendant-appellant.

David H. Leroy, Atty. Gen., John Michael Brassey, Deputy Atty. Gen., Lynn E. Thomas, Sol. Gen., Boise, for plaintiff-respondent.

BAKES, Chief Judge.

The defendant, Joseph Carter, appeals his conviction for voluntary manslaughter. On September 4, 1977, the defendant was arrested for the shooting death of Larry Tolley. Although there is some conflict in the evidence, the events leading up to the arrest of Carter appear to be substantially as follows. For some time prior to the death of Larry Tolley, the defendant and Larry Tolley's wife had developed an intense dislike for each other. Every time Mrs. Tolley would pass by the defendant, regardless of where it might be, she would make a particular rude gesture to him. The night before the killing, the defendant and Mrs. Tolley exchanged some angry words, the defendant calling Mrs. Tolley several offensive names. Larry Tolley, who was present, remained quiet. The defendant and Larry Tolley appear to have been good friends, despite the animosity existing between Mrs. Tolley and defendant.

The next evening, the date of the shooting, Larry Tolley drove up to the residence

of the defendant. Tolley had been drinking heavily, his blood alcohol level later being measured at .20%. Tolley was visibly upset about the proceedings of the previous night, and the defendant's derogatory remarks concerning Mrs. Tolley. After exchanging heated words while standing in the yard, the defendant walked away from Tolley and went up to the porch. The defendant's wife told Tolley to get off the property, and Tolley said, "I will get you." He went to his truck and pulled out a handgun. At that point, the defendant's son, age 1½ years, ran out into the yard, and the defendant's wife ran after him. The defendant went into the house and got an antique shotgun. By then the defendant's wife had caught the little boy, and she was running back toward the house. Tolley was aiming the gun in her direction, saying "I am going to get you." At that point, the defendant shot Tolley with the shotgun. Tolley retreated and jumped inside the pickup. The defendant testified that Tolley raised up with his gun a second time after he got in the pickup, and the defendant shot him again.

The defendant went back in the house, obtained more shotgun shells, and returned to the scene. The door to the pickup truck was now shut, and the defendant approached the truck. He testified that he was going to get Tolley's gun and see how badly he was hurt. The record discloses that the defendant stuck his shotgun through the window and shot Tolley again at close range. The defendant testified that he thought Tolley was raising up again with his gun; however, there was evidence from which the jury could have found that Tolley dropped his gun before entering the truck. Tolley died as a result of the inflicted injuries.

On appeal, the defendant raises several issues, each of which will be discussed in turn.

## I

The defendant first challenges the sufficiency of the evidence supporting his conviction for voluntary manslaughter. His contention is that the evidence clearly reveals a case of justifiable homicide.

Although a person has the right to use deadly force to defend his spouse and children as well as himself from the infliction of great bodily injury, the exercise of that right must be grounded upon a reasonable apprehension of imminent harm, and a reasonable belief that the killing is necessary to protect against such injury. I.C. § 18–4009; *People v. Pierson*, 2 Idaho 76, 3 P. 688 (1884). Once the victim has retreated and the danger is abated, the privilege of self defense expires. *People v. Pierson, supra; see also State v. Powers*, 117 Ariz. 220, 571 P.2d 1016 (1977); *Peterson v. State*, 86 Okl.Cr. 302, 192 P.2d 286 (1948). However, whether a retreat by the victim is sufficient to abate the danger, reasonable apprehension, and necessity supporting the privilege of self defense is a question properly left to the jury. *See People v. Pierson, supra.* In the present case, we find that there was substantial and competent evidence to support the jury's conclusion that the defendant was guilty of voluntary manslaughter. Under such circumstances, the verdict of the jury will not be disturbed on appeal. *State v. Horn*, 101 Idaho 192, 610 P.2d 551 (1980); *State v. Clayton*, 101 Idaho 15, 607 P.2d 1069 (1980).

The next issue raised concerns whether an instruction on self defense impermissibly shifted the burden of proof to the defendant. However, the defendant did not object to the instruction at trial and is therefore deemed to have waived any objection to it. I.C.R. 30 (effective July 1, 1980); *State v. Owens*, 101 Idaho 632, 619 P.2d 787, 795 (1980). Therefore, we do not decide that issue. *State v. Owens, supra; Hankerson v. North Carolina*, 432 U.S. 233, 244 n. 8, 97 S.Ct. 2339, 2346, 53 L.Ed.2d 306 (1977).

## II

The defendant also asserts that he was denied his right to a speedy trial based on I.C. § 19–3501, I.C. § 19–106, Idaho Constitution Art. 1, § 13, and the sixth and four-

teenth amendments to the United States Constitution.[1] On September 6, 1977, a criminal complaint was issued charging Carter with voluntary manslaughter. An information setting forth the same charge was filed on October 7, 1977. Various pretrial matters were then raised by both parties. Trial was set for mid-March, 1978, although the record is not specific as to the date. The defendant indicates March 16, 1978, was the date for trial, and this date does not appear to be disputed by the state. On March 6, 1978, the defendant moved to quash the information, claiming that the jury panel had not been selected according to proper procedure. Although the judge's order in response to the motion is not contained in the record, it appears undisputed that the judge agreed that the jury panel had not been selected in conformance with state law. Instead of dismissing the information, however, he rescheduled the trial for April 18, 1978. On April 7, 1978, the defendant moved for dismissal on the ground that he had been denied his right to a speedy trial. The motion was denied on April 10, 1978, and trial was held from April 18, 1978, to April 20, 1978.

■ On October 7, 1977, when the information was filed, I.C. § 19–3501 required that a criminal action be dismissed if the defendant is not tried during the *next term of court* after the information is triable, unless good cause to the contrary is shown.[2] *State v. Hobson*, 99 Idaho 200, 202, 579 P.2d 697, 699 (1978). However, effective March 31, 1975, the Idaho legislature repealed I.C. § 1–706 which required at least two court terms per year in each county. This repeal was in response to this Court's promulgation of I.R.C.P. 77(a), effective January 1, 1975, which abolished terms of court. While I.R.C.P. 77(a) did not expressly apply to criminal cases, the action of the legislature in repealing § 1–706 was general, and applied to both civil and criminal actions. Therefore, we conclude that the action of the legislature in repealing I.C. § 1–706, and the action of this Court in promulgating I.R.C.P. 77(a) precludes determining the right to a speedy trial by reference to terms of court for cases filed after the effective date of the repeal of I.C. § 1–706.[3]

That is not to say, however, that there was no provision in the Idaho law for a

1. "[I.C. §] 19–3501. WHEN ACTION MAY BE DISMISSED.—The court, unless good cause to the contrary is shown, must order the prosecution or indictment to be dismissed, in the following cases: .

. . . . .

"2. If a defendant, whose trial has not been postponed upon his application, is not brought to trial at the next term of the court in which the indictment is triable, after it is found."
"[I.C. §] 19–106. RIGHTS OF DEFENDANT. —In a criminal action the defendant is entitled:
"1. To a speedy and public trial.
. . . ."
"[Art. 1] § 13. GUARANTIES IN CRIMINAL ACTIONS AND DUE PROCESS OF LAW.—In all criminal prosecutions, the party accused shall have the right to a speedy and public trial; . . . ."
United States Constitution, Amendment 6: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, . . . ."

2. 1980 Idaho Sess.Laws, ch. 102, § 1, amended I.C. § 19–3501 to read as follows: "19–3501. WHEN ACTION MAY BE DISMISSED.—The court, unless good cause to the contrary is shown, must order the prosecution or indictment to be dismissed, in the following cases:

. . . .

"2. If a defendant, whose trial has not been postponed upon his application, is not brought to trial within six (6) months from the date that the indictment or information is filed with the court."

3. Although the trial in this case took place during the Jefferson County term of court which began March 14, 1978, no terms of court were officially designated for the year 1977. The defendant argued below that had custom been followed in setting terms of court for 1977, the trial date in this case would have been later than that permitted under I.C. § 19–3501. In considering this argument, the court indicated that while terms were customarily set to begin in March and September, and usually continued for approximately six months, fall terms had been set on occasion for as late as October 13. Had the fall 1977 term begun on October 7, the date the information was filed, or earlier, there would have been no § 19–3501 problem. However, to pinpoint a date in time when the fall 1977 term might or should have begun is mere speculation and would serve no purpose. The district court refused to speculate on such a date, and we also decline to do so.

speedy trial after the repeal of I.C. § 1–706. The right to speedy trial is guaranteed by Idaho Const. Art. 1, § 13, and I.C. § 19–106 which merely restates the protection granted by Idaho Const. Art. 1, § 13. Both are comparable to that protection provided by the sixth and fourteenth amendments to the United States Constitution. In *State v. Lindsay*, 96 Idaho 474, 531 P.2d 236 (1975), we held that the "balancing test" laid down in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), for interpreting the federal guarantee of speedy trial, is consistent with the protection afforded by our own state constitution and statutes.

The factors to be considered in the balancing test are as follows: (1) length of delay, (2) reasons for the delay, (3) the defendant's assertion of his right, and (4) prejudice to the defendant. *Id.* at 530, 92 S.Ct. at 2192. The length of delay in this case as measured from the date the criminal complaint was issued to the date of trial was seven and one-half months. There is no contention that the prosecution engaged in dilatory tactics. In fact, although the defendant had a legitimate right to complain about the jury panel selection procedure, nevertheless delay past the March 16, 1978, trial date followed from the defendant's motion to dismiss. The defendant lodged no objection to the March 16, 1978, trial date, and objection to the later trial date was not raised until just eleven days before trial. Finally, the defendant admits in his brief that "[t]he last criteria actual prejudice, cannot be demonstrably asserted by the record." The facts of this case are certainly no more compelling than those in *State v. Lindsay, supra*, where we found no violation of a right to speedy trial after a delay of fourteen months. Consequently, we find no violation of the defendant's right to speedy trial.

### III

Error is also claimed in the admission of the defendant's "mug shot" as evidence, over the objection of defense counsel. The photograph in question was taken at the police station following the defendant's arrest and showed him with long hair, beard, and generally unkempt appearance. The numbers and language at the bottom of the photograph, indicating it was a "mug shot," were removed prior to the photo's admission into evidence. The defendant argues that there was no issue of identity in the case and that the photograph was therefore irrelevant and was presented merely to inflame and impassion the jury against him. However, the defendant opened up the subject of the appearances of the parties at the time of the incident by first admitting a photograph of the victim during the cross examination of Mrs. Tolley. The victim's photo was also a police "mug shot" photo, apparently taken sometime before the shooting, showing him with long hair and unkempt appearance, and was admitted for the purpose of indicating the victim's general appearance at the time of the shooting. The victim's wife testified that Tolley's appearance at the time of the shooting was similar to that represented in the photograph. The state offered the photograph of the defendant for the same purpose.

Photographs showing the contemporaneous scene of a crime or appearance of a person are generally admissible in the discretion of the trial court, unless the photograph is so inflammatory that its probative value is outweighed by the prejudice which might result from its inflammatory nature. As was stated in *State v. Kleier*, 69 Idaho 278, 286, 206 P.2d 513, 518 (1949),

"Photographs and pictures relevant to describe a person, place or thing are admissible for the purpose of explaining and applying the evidence and assisting the jury in understanding the case. Such evidence is used to clarify and present a more comprehensive explanation of the physical facts than could be obtained from the testimony of witnesses."

Both the photograph of the victim and the photograph of the defendant were offered and admitted into evidence for the purpose of showing the appearance of the parties at the time of the incident. In *State v. Cunningham*, 97 Idaho 650, 653, 551 P.2d 605, 608 (1976), we upheld the admissi-

bility of a "mug shot" of a defendant, in part, for the reason that "the mug shot showed a change in the appellant's appearance from the time the photo had been taken to the time of the trial." Here, the record discloses that the defendant, at the time of the trial, had changed his appearance from what it was at the time of the crime by cutting his long hair and removing his beard. It is clear from the record that at least part of the reason for Mrs. Tolley's dislike of the defendant was his appearance. Also, the court in overruling the defendant's objection to admission of the photograph stated,

"It seems to me that it might help to explain some of the things in this case. For instance, the first witness said that she didn't like him and the reason she didn't like him was because his hair was long and he had a long beard and he looked sloppy and this bears out her testimony."

Certainly, the photograph of the defendant aids in "explaining and applying the evidence and assisting the jury in understanding the case." We conclude, therefore, that the trial court did not err in admitting the photograph of the defendant in order to permit the jury to have an accurate contemporary view of the circumstances of the crime.

█ Even assuming that the admission of the defendant's contemporaneous photograph was immaterial and erroneous, this Court has held that a party may not object to immaterial evidence which is introduced to counteract immaterial evidence of the same nature which he himself has introduced. *State v. Breyer*, 40 Idaho 324, 338, 232 P. 560, 565 (1925). Stated another way, "An opponent may reply with similar evidence if it is needed to eradicate an unfair prejudice which might ensue from the original [immaterial] evidence." *People v. Wilbert*, 15 Ill.App.3d 974, 305 N.E.2d 173, 180 (1973). The right to rebut such unfair prejudice applies to the state as well as the defendant. *E. g., People v. Wilbert, supra.* The victim's "mug shot" showing his long hair and beard, particularly when coupled with the defendant's change in appearance

at trial, might well have created a false impression in the minds of the jurors. Consequently, under the circumstances of this case, we find no error in the admission of the defendant's "mug shot" into evidence.

## IV

The defendant next argues that the court committed error in allowing the state on rebuttal to call the defendant's wife to testify solely for the purpose of setting up her own impeachment. It is asserted that a party is not allowed to call a witness to lay a foundation for impeachment when the party has already had the opportunity to impeach during a prior cross examination. A review of the facts pertinent to this issue is necessary. Mrs. Carter was the closing witness for the defense. She testified among other things that she had seen Tolley take his gun out of the truck and point it in her direction. She also testified on cross examination that she had talked to Larry Hanner the day following the incident and had related to him the events of the preceding day. However, the specific content of that conversation was not disclosed. The defense then rested. The state on rebuttal called Hanner to testify that Mrs. Carter had told him she had not seen Tolley with a gun, but that she had seen her husband get a gun out of Tolley's truck after the shooting. Before the questioning was completed, however, the defense objected and the court determined that there was insufficient foundation for impeachment, since Mrs. Carter had never been questioned concerning specific statements. *See* I.R.C.P. 43(b)(8). The prosecution was then permitted, over the objection of defense counsel, to recall Mrs. Carter to the stand. Mrs. Carter was then questioned concerning her conversation with Hanner. She denied having said that she had not seen a gun in Larry Tolley's hand. Hanner was then recalled, and he gave his testimony concerning the conversation with Mrs. Carter.

The Idaho Rules of Civil Procedure govern the admission of testimony in criminal

proceedings. I.C.R. 26. I.R.C.P. 43(b)(5) states that "after the examinations on both sides are once concluded, the witness cannot be recalled by the same party without leave of the court. Leave shall be granted or withheld by the court in the exercise of sound discretion." In the present case the prosecution wished to recall Mrs. Carter for further cross examination to lay a foundation for impeachment pursuant to I.R.C.P. 43(b)(8).

In *State v. Anthony*, 6 Idaho 383, 55 P. 884 (1899), after both sides had concluded, the prosecution was permitted, over defendant's objection, to recall the defendant for the purpose of laying a foundation for impeachment. The defendant was questioned concerning certain prior bad acts, which he denied. Another witness was then called for the first time and testified that the prior acts had in fact occurred. Although the case was reversed because the prior bad acts were irrelevant and not a proper basis for impeachment, the procedure through which the impeachment was conducted was recognized as proper under Idaho Rev.Stat. § 6081 (1897). Idaho Rev. Stat. § 6081 is the predecessor to, and substantially the same as, I.R.C.P. 43(b)(5). We therefore find that the recall of Mrs. Carter solely for the purpose of establishing a foundation for her own impeachment was a discretionary matter for the court, and we find no abuse of that discretion.

### V

As a final issue, the defendant urges that he was denied his constitutional right to the effective assistance of counsel before and during the trial in this case. The claimed deficiencies are as follows: (1) failure to request a change of venue; (2) failure to request the suppression of certain evidence; (3) failure to request the exclusion of witnesses from the courtroom when not testifying; (4) failure to challenge the ability of a lay magistrate to conduct the preliminary hearing.

4. If evidence to the contrary is available outside the record, it may be presented only by way of a petition for post conviction relief pursuant to I.C. § 19–4901 *et seq.* *State v.*

As was stated in *State v. Tucker*, 97 Idaho 4, 10, 539 P.2d 556, 562 (1975):

"This Court will not attempt to 'second guess strategic and tactical choices made by trial counsel'. ... However, when counsel's strategy decisions are made upon the basis of inadequate preparation, ignorance of the relevant law, or other shortcomings capable of objective evaluation, the defendant may well have been denied the competent assistance of counsel."

The items listed above fall into the area of strategic and tactical choices of counsel. The record in this proceeding is devoid of any indication that such choices were a result of inadequate preparation or ignorance of counsel. Absent such evidence, it must be presumed that defense counsel's actions were not due to inadequate preparation or ignorance, and that defendant's representation by counsel was competently carried out. *State v. Tucker, supra.*[4] In addition, as for Item No. 4 listed above, it is clear from out statutes and rules that lay magistrates may be assigned to conduct preliminary hearings in all criminal proceedings. I.C. § 1–2208(3)(d); I.R.C.P. 82(c)(1)(A). There is no evidence to indicate that the magistrate in this case was not properly assigned by the district judges of his district to conduct the preliminary hearing. Consequently, we find no error.

The judgment of the conviction is affirmed.

McFADDEN and DONALDSON, JJ., concur.

BISTLINE, Justice, dissenting.

In two areas I question the Court's opinion: (1) the treatment of the instruction on self-defense, and (2) the analysis of the use of the "mug shot" of defendant.

### I.

As part of its instructions on self-defense, the trial court gave the following instruction:

*Blackburn*, 99 Idaho 222, 579 P.2d 1205 (1978); *State v. Kraft*, 99 Idaho 214, 579 P.2d 1197 (1978).

"You are instructed that to justify a killing on the grounds of self-defense or of defense of one's wife or one's family it is necessary to establish that the person doing the killing was without fault in bringing on the difficulty, that is, that he was not the aggressor and did not promote the conflict."

Although not objected to by defendant, the attorney for the state on appeal, Mr. Brassey, in a most commendable performance of his duties [1] has suggested that this instruction, viewed in isolation,[2] might constitute fundamental error such that this Court could review it even though not objected to below. *See State v. Haggard*, 94 Idaho 249, 486 P.2d 260 (1971). Nevertheless, the Court neatly sidesteps this issue with the terse statement that the defendant waived any objection by failing to make it at trial. Failure to object, however, does not preclude an examination of error which is contended to be fundamental, to which proposition I will directly return.

As to the merits of this argument, I would agree with those courts that hold that under *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), the burden of proving self-defense cannot be shifted to the defendant.[3] *See, e. g., State v. Millett*, 273 A.2d 504 (Me.1971); *Commonwealth v. Stokes*, 583 Mass. 374, 374 N.E.2d 87 (1978); *Kelso v. State*, 588 P.2d 1035 (Nev.), cert. denied 442 U.S. 921, 99 S.Ct. 2846, 61 L.Ed.2d 289 (1979); *State v. McLaurin*, 233 N.C.App. 589, 235 S.E.2d 871 (1977); *State v. Roberts*, 88 Wash.2d 337, 562 P.2d 1259 (1977). *See* generally Anno., 43 A.L.R.3d 221 (1972). *Cf. State v. Lundhigh*, 30 Idaho 365, 164 P. 690 (1917) (under 1887 Rev.Code § 7866 defendant must establish circumstances to extent that jury

has reasonable doubt as to his guilt), *overruled on other grounds State v. McMahon*, 57 Idaho 240, 65 P.2d 156 (1937); *Hankerson v. North Carolina*, 432 U.S. 233, 97 S.Ct. 2339, 53 L.Ed.2d 306 (1977) (Court declines to decide whether due process requires the prosecution to disprove self-defense beyond a reasonable doubt).

The question then is twofold: (1) whether an instruction which impermissibly shifts the burden of proof constitutes "fundamental error" such that a failure to object below does not preclude this Court from examining that instruction, and (2) whether the instruction in the present case was erroneous.

In *State v. Haggard*, 94 Idaho 249, 486 P.2d 260 (1971), this Court stated:

"[T]he obligation of the state to see that defendant receive a fair trial is primary and fundamental. . . . In case of fundamental error in a criminal case the Supreme Court may consider the same even though no objection had been made at time of trial. . . . We agree with appellant that the cross-examination of the defendant (appellant) regarding his failure to testify at the preliminary hearing deprived appellant of a fair trial and was a denial of due process." *Id.* at 251, 486 P.2d at 262.

To my mind the question of whether an instruction impermissibly shifting the burden of proof constitutes "fundamental error" was answered in the affirmative by the United States Supreme Court in *Hankerson v. North Carolina*, 432 U.S. 233, 97 S.Ct. 2339, 53 L.Ed.2d 306 (1977). The trial court in *Hankerson* had instructed the jury that to show self-defense "the defendant must prove not beyond a reasonable doubt but simply *to your satisfaction* that he acted in

---

1. Just as the duty of the prosecutor is to seek justice, not merely to convict, ABA Standards Relating to the Prosecution Function and Defense Function § 1.1(c) (1970), so should the office of the Attorney General seek to assure that there has been justice in the criminal trials appealed to this Court. All parties—the state, the defendant, and this Court—must ensure that there has been no fundamental error below, whether objected to or not.

2. The state maintains that the instructions viewed as a whole were correct.

3. Since there is substantial evidence of self-defense here (see dissenting opinion of Justice Shepard), I do not address whether the defendant must initially produce some evidence on his affirmative defense before the prosecution is required to prove beyond a reasonable doubt the absence of such affirmative defense.

self-defense." *Id.* at 236–37, 97 S.Ct. at 2341–42. The North Carolina Supreme Court held that placing the burden of proving self-defense on the defendant violated the due process concepts announced in *Mullaney. State v. Hankerson*, 288 N.C. 632, 220 S.E.2d 575 (1975). The North Carolina court, however, refused to give Mullaney retroactive effect.

The United States Supreme Court held that the reasonable-doubt standard of proof is of substantial enough importance that *Mullaney* had to be applied retroactively:

"In *Ivan V. v. City of New York, supra,* 407 U.S. [203], at 204–205, 92 S.Ct. [1951] at 1952, [32 L.Ed.2d 659] this Court addressed the question whether our decision in *In re Winship*, [397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368] supra—holding the reasonable-doubt standard applicable to state juvenile proceedings—was to be applied retroactively. The court there said:

. . . .

" '*Winship* expressly held that the reasonable-doubt standard "is a prime instrument for reducing the risk of convictions resting on factual error. The standard provides concrete substance for the presumption of innocence—that bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law' . . . . 'Due process commands that no man shall lose his liberty unless the Government has borne the burden of . . . convincing the factfinder of his guilt.' To this end, the reasonable-doubt standard is indispensable, for it 'impresses on the trier of fact the necessity of reaching a subjective state of certitude of the facts in issue.' " 397 U.S., at 363–364 [90 S.Ct. at 1072].

" 'Plainly, then, the major purpose of the constitutional standard of proof beyond a reasonable doubt announced in *Winship* was to overcome an aspect of a criminal trial that substantially impairs the truth-finding function, and *Winship* is thus to be given complete retroactive effect.' 407 U.S., at 204–205, 92 S.Ct., at 1952.

*Ivan V.* controls this case. In *Mullaney v. Wilbur,* as in *In re Winship,* the Court held that due process requires the States in some circumstances to apply the reasonable-doubt standard of proof rather than some lesser standard under which an accused would more easily lose his liberty. In *Mullaney,* as in *Winship,* the rule was designed to diminish the probability that an innocent person would be convicted and thus to overcome an aspect of a criminal trial that 'substantially impairs the truth-finding function.'

. . . .

"[W]e have never deviated from the rule stated in *Ivan V.* that ' "[w]here the *major* purpose of new constitutional doctrine is to overcome an aspect of a criminal trial that *substantially* impairs its truth-finding function and so raises *serious* questions about the accuracy of guilty verdicts in past trials, the new rule [is] given complete retroactive effect." ' 407 U.S., at 204, 92 S.Ct., at 1952 (emphasis added). The reasonable-doubt standard of proof is as 'substantial' a requirement under *Mullaney* as it was in *Winship.* Respondent's attempt to distinguish *Ivan V.* is without merit". 432 U.S. at 241–44, 97 S.Ct. at 2344 (footnotes omitted).

The question of who has the burden of proof is so fundamental to a fair trial that an improper allocation of that burden completely distorts the factfinding process. As stated in *State v. Gideons,* 52 Ohio App.2d 70, 368 N.E.2d 67 (1977), in holding that the court could consider the correctness of an instruction on self-defense regardless of whether an objection had been made below:

"To properly decide a criminal case, it is essential that the jury has a clear understanding of which party has the burden of proof. Without such an understanding, the jury cannot possibly properly perform its function. When in a criminal case the trial court erroneously places the burden of proof on the defendant, that error affects substantial rights of the accused and affects the basic fairness, integrity and public reputation of the judicial process. Such an error is plain

error under Crim.R. 52(b) and may be reviewed by an appellate court even when the accused failed to object to the jury instruction as required by Crim.R. 30." *Id.* 368 N.E.2d at 73.

Thus I conclude that this Court is required to examine the jury instruction placed in question in the present case.

In examining that instruction it should be remembered that instructions "must be considered as a whole, and error cannot be predicated upon a single instruction or part thereof which may be objectionable when not considered in connection with the instructions as a whole . . . ." *State v. Tope,* 86 Idaho 462, 469, 387 P.2d 888, 892 (1963). In the present case, the questioned instruction was confusing and erroneous. Reading the instructions in their entirety [4] I am not sufficiently persuaded to the conclusion that the giving of this particular instruction did not constitute reversible error.

In considering this issue, I am much influenced by the separate opinion of Justice Lake in *State v. Hankerson,* 288 N.C. 632, 220 S.E.2d 575, 592 (1975). In an effort to move the North Carolina Supreme Court from "reliance upon the broken reed of this Court's power to declare *Mullaney v. Wilbur, supra,* nonretroactive," to safer ground, he would have had that court there hold that:

"Since the instruction that the defendant must prove absence of malice or presence of justification 'to the satisfaction of the jury' does not place upon him the burden of persuading or convincing, but only the burden of creating a reasonable doubt, it serves no useful purpose and its use should be discontinued." *Id.* 220 S.E.2d at 595.

The effort of Justice Lake failed both in his own court and again before the United States Supreme Court, the latter court holding, as would I, that an instruction which substantially impairs the truth-finding function is reversible error requiring a new trial free of that defect.

An earlier Idaho court in a unanimous opinion which long preceded the similar and more heralded statement in *State v. Haggard, supra,* was not slow to hold that mere inadvertence of counsel should not preclude a defendant (there a murder defendant) "from claiming the right of fair trial." *State v. Foyte,* 43 Idaho 459, 464, 252 P.2d 673, 674 (1927).

It is to be regretted that this Court, again acting much as a woman with her favors, will nobly advance the doctrine of fundamental error, as it did in *Haggard,* and 44 years earlier in *Foyte,* but thereafter abruptly retreat from those precedents as fancy is or is not taken to each case coming before it.

Justice Shepard accurately portrays the closeness of this case, which in his opinion factually does not justify the verdict of the jury as a verdict which reasonable jurors should have reached on the evidence before them. Adding to his illuminating effort the error of the instruction and the interjection of improper evidence (hereafter discussed), offered solely to prejudice the jury, the sum total does not equal the fair trial to which all are entitled.

## II.

It would be indeed difficult for me to on any hypothesis uphold the district court's ruling which allowed the state to place before the jury the photograph of the defend-

---

4. In particular, note is taken of instructions 9, 10 and 13:

No. 9: "To convict the defendant of voluntary manslaughter, the State must prove each of the following elements:

. . . .

"3. The killing was unlawful and without justification."

No. 10: "You are instructed that a defendant in a criminal case is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he *is entitled to an acquittal.*"

No. 13: "If a killing is justified on account of self defense then the defendant must be acquitted."

The totality of the instructions given in *Hankerson,* set forth at 220 S.E.2d 575, 593, and at 432 U.S. 236–37, 97 S.Ct. 2341–42, is essentially the same as given to Carter's jury.

ant. The Court's opinion, however, declares that the photo was admissible as an aid in "explaining and applying the evidence and assisting the jury in understanding the case." Secondly, in apparent disbelief of this doubtful premise, the Court adds that even if this photo was immaterial and prejudicial, still it became properly admissible to rebut the unfair prejudice resulting from defendant's introduction of a photograph of the deceased—an "invited error" hypothesis.

### A.

The following examination of the victim's wife, Bobbie, by defense counsel led to the introduction of the victim's photo:

"Q   Now, you mentioned that the reason that you hated Joe Carter was because he had long hair?

"A   Yes.

"Q   Did Larry [the victim] have long hair?

"A   Well, that wasn't the only reason I hated him.

"Q   Didn't Larry have long hair?

"A   Yes, but it wasn't filthy and dirty all the time.

"Q   Did he have a beard?

"A   Yes, he had a beard.

(Defendant's Exhibit A was marked for identification.)

"Q   (By Mr. Fanning)   I am going to hand you Defendant's Exhibit A and will you state whose picture that is?

"A   It is Larry's.

"Q   Is that what he looked like about the day of this incident?

"A   Yes.   He looked something like that, but not that rough.

"Q   But he had long hair and beard and all that?

"A   Yes."

The state then objected, *not* to the introduction of the photograph of the victim, but only to the extraneous matter which identified it as a "mug shot":

"MR. GROVER: I object, Your Honor, to all of the extraneous matter contained on the exhibit.   There is much more on here than the photograph.

"MR. FANNING: We will limit it just to the photograph, Your Honor.

. . . .

"MR. GROVER: Your Honor, if they want to cut the photograph out perhaps that is admissible."

It is thusly seen that the state did not object to the introduction of this photograph which was, if anything, merely illustrative of the testimony given as to how the victim looked on the day he instigated his attack on the defendant, a line of testimony opened up by the state in developing the animosity of the victim's wife to defendant because of her dislike of his long hair—all of which was extremely collateral to the serious issues being tried.

The challenged introduction of the defendant's photograph had nothing to do with the animosity problem and came about in a wholly disjointed manner, sometime later in the trial, and certainly not in the manner of quick rejoinder usually associated with invited error.

"Q   (By Mr. Grover)   Now, Mr. Johnson, when Mr. Carter was brought into the Sheriff's Office is there a booking procedure that is followed?

"A   Yes.

"Q   In connection with that was there a photograph taken of him?

"A   Yes.

"Q   Mr. Johnson, do you have that photograph?

"A   It is in the folder there."

The state's basic argument offered in support of the admissibility of this photo was "I think the jury is entitled to know how he looked at the time of this incident."   The court overruled defendant's objection, stating:

"[I]t seems to me that it might help to explain some of the things in the case. For instance, the first witness said that she didn't like him [the defendant] and the reason she didn't like him was because his hair was long and he had a long

beard and he looked sloppy and this bears out her testimony."

The court was misled onto an avenue of irrelevance. The cause of friction, though of interest, was not in any sense a triable issue. The introduction of this photo was error. The prosecutor's only argument— that the jury had seen a picture of the victim with long hair and a beard, and that fair play required that they should also see a picture of the defendant as he had earlier appeared—was farfetched.

The Court upholds this picture's admissibility as an aid in "explaining and applying the evidence and assisting the jury in understanding the case." To support this assertion the Court cites two cases, *State v. Kleier*, 69 Idaho 278, 206 P.2d 513 (1949), and *State v. Cunningham*, 97 Idaho 650, 551 P.2d 605 (1976), neither of which here has any significance whatever. The picture in dispute in *Kleiner* was of the robbed safe with papers strewn about. In *Cunningham*, the picture of the defendant was introduced to prove an extrajudicial identification of the defendant.

Assuming there is any substance to the theory that this picture was helpful as explaining earlier evidence, the probative value—and I see none—was clearly outweighed by the potential prejudicial effect. Earlier testimony had shown the jury that defendant and the victim both wore long hair and beards at the time of the altercation. This picture of defendant was obviously offered for and could have served no purpose beyond attempting to prejudice the jury which would decide his fate.[5] This is not a case where the defendant's identification was in question; he admitted firing the shots. The only real question was whether he acted in self-defense, and his hair style at the time of the shooting did not bear a scintilla of relevance to that question.

### B.

As to the issue of invited error, it must be noted at the outset that there was no issue drawn on the admissibility of the victim's photograph. It was extremely remote, probative of nothing, and could have been excluded, and most likely would have been had not the prosecutor in effect withdrawn his motion when objectionable material was excised. The photograph of the defendant was not admissible under any view, but for certain not on the basis of "invited error," which was not the premise used for its entry into evidence. At the risk of lengthening this opinion, but firmly of the belief that all accused persons should have fair trials, it is necessary to consider the three divergent approaches taken by courts to the question of "invited error," or "opening the door." While some courts hold that the admission of an inadmissible fact justifies the opponent in resorting to similar inadmissible evidence, *see, e. g., State v. Mercer*, 13 Ariz.App. 1, 473 P.2d 803 (1970) (defendant opened door); *Larson v. Pischell*, 13 Wash.App. 576, 535 P.2d 833 (1975) (plaintiffs cannot complain where they raised the subject in their case in chief); *Sanville v. State*, 593 P.2d 1340, 1344 (Wyo.1979) (cannot complain if "adversary is also allowed to avail himself of the opening within its scope"), other courts hold that the admission of an inadmissible fact, without objection, does not justify the opponent in also introducing inadmissible facts to rebut. *See, e. g., Torres v. State*, 519 P.2d 788 (Alaska 1974) (introduction of improper evidence without objection does not justify introduction of similar evidence by other party); *Laursen v. Tidewater Associated Oil Co.*, 123 Cal.App.2d 813, 268 P.2d 104, 106 (1954) ("[t]he so-called 'open the gates argument' is a popular fallacy"); *Savannah*

---

5. The defendant violated no law in having worn his hair long, which was his right as was his concomitant right to cut it. Had the defendant been tried before a jury of his (long-haired) peers, he likely would have left his hair as it was. Any attorney who would allow a long-haired client to go so attired before a jury in Idaho would be guilty of malpractice. Any ordinary juror who claims that he can view a long-haired defendant without at least some conscious or subconscious prejudice is either unusual in the extreme, or a hypocritical prevaricator. The same can be said of some judges as well, a statement I can make knowing of at least one whose wife would be the first to confirm that fact.

*News-Press, Inc. v. Hartridge*, 110 Ga.App. 203, 138 S.E.2d 173 (1964) (introduction of objectionable evidence without objection did not entitle defendant to rebut it with similar evidence). Still other courts hold that the opponent may reply with similar evidence only when it is necessary in order to remove any unfair prejudice which might have resulted from the original evidence. *See, e. g., Herget National Bank v. Johnson*, 21 Ill.App.3d 1024, 316 N.E.2d 191 (1974) (if one party opens up issue, other can introduce contradictory or explanatory evidence only if he would be prejudiced from the unexplained evidence); *Roy v. Commonwealth*, 191 Va. 722, 62 S.E.2d 902, 905 (1951) (immaterial evidence "may be rebutted if necessary to prevent an unfair inference or prejudice which might otherwise exist"). *See generally* McCormick on Evidence § 57 (2d ed. 1972); 1 Wigmore on Evidence § 15 (3d ed. 1940).

In the only case in Idaho which considered the issue, *State v. Breyer*, 40 Idaho 324, 232 P. 560 (1925), the appellant, who was accused of first degree murder, introduced evidence that his wife met the victim at the victim's house, and that the victim had arranged the meeting after the time when appellant had ordered the victim to keep away from his wife. The state then introduced evidence that the meeting was for the purpose of taking up a mortgage which the victim held on some sheep in which she had an interest. This Court held that "[t]he evidence was not prejudicial. Appellant was estopped to object to it because it was introduced to meet immaterial evidence which he himself had introduced. The error, if any, was invited." *Id.* at 338, 232 P.2d at 565. I submit that that case provides no basis for holding that the challenged evidence in the present case was inadmissible.

Under the third approach, which the Court is apparently today adopting,[6] some prejudice is required before other inadmissible evidence can be introduced in rebuttal. The Court argues that the picture of the victim prejudiced the state by creating a false impression in the minds of the jurors. However, there was sufficient testimony as to their relative appearances that introduction of this picture was unnecessary to rebut any such impression. The introduction of the photo of the victim in the present case in no way prejudiced the state. Even if the victim's photo *did* prejudice the state, introducing a photo of the *defendant* was not "rebutting" the introduction of the victim's photo.[7] Under the second approach, that other inadmissible facts cannot be introduced where the opponent did not object, the state did not object here, and thus they cannot now seek to offer other inadmissible evidence.

Finally, there remains the rule that the opponent may resort to similar inadmissible evidence, or as stated by this Court in today's opinion, "[a] party may not object to immaterial evidence which is introduced to counteract immaterial evidence of the same nature which he himself introduced." Under this statement, the only way to justify introduction of the defendant's photo would be to say that the victim's photo *may* have prejudiced the jury against the deceased. If so, of what consequence? Are we to presume that we have jurors in Idaho who would acquit a defendant simply because the person he shot favored wearing long hair? I stand aghast at the thought. If there be jurors of such a frame of mind, it is a grievous fault, and hopefully any so possessed will not get by jury selection. But whatever the answer here may be, can it also be that the *state* can attempt to obtain a conviction on the strength of the

---

6. The Court first cites *State v. Breyer*, 40 Idaho 324, 232 P. 560 (1925), apparently with approval. That case followed the first approach. The Court then cites *People v. Wilbert*, 15 Ill. App.3d 974, 305 N.E.2d 173 (1973), which followed the third approach. It would be helpful

if the Court would explicitly state which approach it is following.

7. Rebuttal evidence would consist of, for example, a picture of the victim with his family, testimony that although he had long hair and a

color or length of a man's hair? I think not.[8]

The deceased's photo was introduced only in connection with the testimony of his widow that she did not like defendant because of his long hair and beard, and the photo showed that the deceased, her husband, also had long hair and a beard. Such was probably offered to impeach her credibility, and, although of doubtful validity, was not improper in the absence of an objection. The photo of the defendant, however, had no bearing on the question of the deceased's appearance, and was not introduced to counteract that evidence. Obviously it was introduced solely to create with the jury an unfavorable impression of the defendant. And it most likely did. As stated in *Wynn v. Sundquist*, 259 Or. 125, 485 P.2d 1085 (1971):

> "The underlying basis for the rule of 'invited error' is that where one party offers inadmissible evidence, which is received, the opponent may then offer similar facts whose only claim to admission is that they negative or explain or counterbalance the prior inadmissible evidence, presumably upon the same fact, subject matter or issue." *Id.* 485 P.2d at 1090.

The final question is whether this error was harmless. The jury here did not accept defendant's defense of self-defense, and convicted him of voluntary manslaughter. The evidence here was very close, so close that it cannot be said that the introduction of this photo did not contribute to the defendant's conviction. *See, e. g., State v. LePage*, 102 Idaho 387, 393–97, 630 P.2d 674, 680–84 (1981); *State v. Griffiths*, 101 Idaho 163, 167 n.1, 610 P.2d 522, 526 n.1 (1980); *State v. Smoot*, 99 Idaho 855, 861,

590 P.2d 1001, 1007 (1978). The evidence that he acted in self-defense is sufficient that, absent the introduction into evidence of this picture, the jury might have acquitted him. Evidence wholly immaterial to the issues being tried was deliberately placed before the jury, the doing of which denied Carter a fair trial. While I can understand that a trial judge caught short in the middle of a trial might succumb to the state's argument for admission, I cannot understand why the Court goes to such extremes to create a basis upon which it declares that no error was committed, or, if so, it was invited by the defendant who, one may be certain, in all likelihood did not comprehend that which the lawyers and judge were squabbling about. I would reverse and remand for a new trial.

SHEPARD, Justice, dissenting.

My view of the record indicates insufficient evidence to support the conviction of Carter and hence I dissent.

The majority correctly indicates that a person has a right to use deadly force to defend his spouse and child as well as himself from the infliction of great bodily injury provided that *he* be under a reasonable apprehension of imminent harm and reasonably believes that deadly force is necessary to protect against this harm. I.C. § 18–4009; *People v. Pierson*, 2 Idaho 76, 3 P. 688 (1884). I believe there is no question, even in the mind of the majority, that Carter initially had the right to use deadly force. Carter knew of the violent tendencies of the deceased when the deceased was intoxicated. The deceased, in an intoxicated condition, had come on the property of Carter

---

beard, he kept it cleaner than the defendant's, etc.

**8.** The ludicrous lengths to which such an approach can be extended were illustrated in *State v. Steidel*, 98 Or. 681, 194 P. 854 (1921). Defense counsel there asked defendant his occupation, which was a gardener. The court held that this entitled the state to ask defendant whether he was "occupied at least part of the time with the Socialist . . . party." *Id.* 194 P. at 856. The court explained its reasoning as follows:

> "His occupation, however, was injected into the case by his own counsel, evidently for the purpose of creating a favorable impression with the jury. He cannot complain, therefore, if he is cross-examined upon the same subject with a view of replacing that impression with an unfavorable one." *Id.*

The trial bench and bar with amazement will see the Court's opinion today as rising to the same heights.

and pointed a gun at Carter's wife and infant son stating, "I am going to get you." Carter, using an antique shotgun, fired at the deceased. The evidence indicates that Carter was aware that the weapon was as dangerous to the person using it as to the intended target.

It is the later actions of Carter upon which the majority focuses and its perception of whether those actions were reasonable under the then existing circumstances. The only direct evidence was that of Carter.

The majority correctly indicates that while one may defend himself against an aggressor, once the aggressor has retreated and the danger is abated, the privilege of self-defense expires. The majority suggests that the circumstances here fall into the above mentioned category. I disagree. The testimony of Carter is clear that whether or not the deceased had "retreated" into the pickup, the danger to Carter and his family had not abated. Carter testified clearly that both times he shot into the truck at the deceased he believed the deceased had a gun and was raising up to shoot him, Carter. I would believe that the question, therefore, was whether it was reasonable for Carter to use deadly force against a drunken aggressor who was pointing a gun at Carter while the aggressor was seated in a pickup. The majority never attempts to answer that question.

Rather, the majority seizes upon one bit of circumstantial evidence, i. e., that the gun the aggressor was initially holding and pointing at Carter's wife and child was dropped "next to the sidewalk where I [a deputy sheriff] found it." In my judgment, the record is totally devoid of any indication of how or when the gun was dropped at the position it was later found. I find no indication whatsoever that the gun was dropped next to the sidewalk before or during the time the deceased was "retreating" to the pickup. There is a total lack of any evidence indicating the existence or lack of existence of a second gun in the pickup. Most of all, there is a total lack of any evidence indicating that Carter knew that the deceased's weapon had been dropped before or during the deceased's entry into the pickup. In fact, the clear, unequivocal testimony of Carter is to the contrary, i. e., that while the deceased was in the pickup he was pointing a weapon at Carter.

This Court has stated: "Circumstantial evidence must be not only consistent and compatible with the guilt of an accused, but it must also be inconsistent with any reasonable theory of his innocence." *State v. Erwin*, 98 Idaho 736, 572 P.2d 170 (1977), quoting *State v. Wilson*, 62 Idaho 282, 111 P.2d 868 (1941). I find nothing in the circumstantial evidence of a gun at a much later period in time being found outside the truck as being inconsistent with Carter's theory of self-defense, i. e., that he believed that the danger had not abated because while the deceased was in the pickup truck he raised up with a gun in his hand and, therefore, Carter's second and third shots were fired in self-defense.

I would reverse the conviction.

BISTLINE, Justice, concurring in the dissent of SHEPARD, Justice.

The majority opinion disposes of a highly critical issue in this casual manner:

> "The defendant testified that he thought Tolley was raising up with this gun; however, there was evidence from which the jury could have found that Tolley dropped his gun before entering the truck."

The majority, however, does not expose the nature of the evidence relied upon for the quoted statement, unless it be that the impeaching testimony admitted in an effort to discredit Mrs. Carter's testimony is thought to have effect as substantive evidence in the case, a proposition of law of even more doubtful validity than the "discretionary" ruling which allowed the prosecution to recall her for the sole purpose of laying a foundation prerequisite to attempting an impeachment as to her credibility.

The shortcoming of the majority opinion leads to no alternative but to concur in the views of Justice Shepard.

BAKES, Chief Justice, on petition for rehearing.

The petition for rehearing in the above entitled action was granted and the matter reargued. The Court has reviewed the record, considered the arguments by counsel, and continues to adhere to the views expressed and the conclusion reached in the earlier opinion.

SHEPARD, J., adheres to the views expressed in his original dissenting opinion.

BISTLINE, Justice, on petition for rehearing.

The fourteen months which have elapsed since a bare majority of the Court voted to deny Carter a new trial free of error, during which time the case was reargued, have served to fortify my views earlier expressed and to which I continue to adhere. When enough votes were cast to grant a rehearing I entertained some hope that the Court might at least be headed for some consistency in the area of fundamental error, an issue which was raised on appeal in the brief submitted by the office of the Attorney General in what I have previously described in the opening paragraphs of my earlier effort, *supra,* as a commendable performance of the duties of that office.

In a subsequent equally commendable performance on the rehearing, Mr. Lynn Thomas, Solicitor General for the office of the Attorney General,[1] met the issue of fundamental error, discussed it, and urged upon the Court that we hold that beyond a reasonable doubt the error in placing upon the defendant the burden of establishing his innocence, per *Mullaney v. Wilbur, supra,* was harmless error. Going to the State's brief:

"I.C. § 18–4006 provides:

'Manslaughter is the unlawful killing of a human being, without malice. It is of two kinds:

1. Voluntary—upon a sudden quarrel or heat of passion.

2. Involuntary—. . . .'

"*Idaho Code* § 18–4009 provides that a homicide is 'justifiable' if it is committed under certain circumstances which constitute self-defense.

"Based on the above statutes, we find that in Idaho the crime of voluntary manslaughter consists of three elements which must be proved by the State: (1) the killing of a human being; (2) the killing was unlawful; and (3) the killing was the result of a sudden quarrel or heat of passion. Unless a justifiable homicide would be considered an unlawful homicide, the State must prove the absence of justification based on self-defense. Thus, placing the burden on the defendant to prove self-defense would be in violation of due process as established by the United States Supreme Court in *In re Winship, supra.*

"Jury instruction number 21 instructed the jury on self-defense as follows:

" 'You are instructed that to justify a killing on the ground of self defense or of defense of one's wife or one's family it is necessary to establish that the person doing the killing was without fault in bringing on the difficulty, that is, that he was not the aggressor and did not provoke the conflict.' (R., p. 93).

"The State believes there are two potential problems with the giving of jury instruction number 21 which the Court may wish to consider on appeal. This instruction (1) confused the issue of who bears the burden of proving self-defense, and (2) incorrectly stated the law on the right of an aggressor or one who provoked the conflict to kill in self-defense.

"The Court is now faced with the question of whether the giving of this incorrect jury instruction so infected the entire trial that the resulting conviction violated Carter's right to due process, or whether this instruction, viewed in the context of the entire jury instructions and the evidence presented at trial, did not violate Carter's right to due process

---

1. Mr. Michael Brassey, who appeared for the State at the first hearing, had left the office of the Attorney General before argument at rehearing.

of law, and therefore any error was waived by failure to object at trial.

"Jury instruction number 21 instructed that 'It is necessary to establish that the person doing the killing was without fault in bringing on the difficulty, that is, that he was not the aggressor and did not provoke the conflict.' (R., p. 93). But, *Idaho Code* § 18–4009, relating to the right to kill in self-defense, provides:

"'... but such person, ... if he [the person who committed the homicide] was the assailant or engaged in mortal combat, must really and in good faith have endeavored to decline any further struggle before the homicide was committed.'

"It is thus clear that the person who kills in self-defense may have been at fault in bringing on the difficulty or in provoking the conflict, if he subsequently declined any further struggle before the homicide was committed. Therefore, instruction 21 incorrectly stated the law regarding an aggressor's right to kill in self-defense." State's Brief on Rehearing.

Under Points and Authorities On Rehearing, the responsive brief of the State included:

"VIII.

"THE OBLIGATION OF THE STATE TO SEE THAT A DEFENDANT RECEIVES A FAIR TRIAL IS PRIMARY AND FUNDAMENTAL. IN THE CASE OF FUNDAMENTAL ERROR IN A CRIMINAL CASE, THE SUPREME COURT MAY CONSIDER AN ERROR EVEN THOUGH NO OBJECTION WAS MADE AT THE TIME OF TRIAL.

*State v. White,* 97 Idaho 708, 551 P.2d 1344 (1976)

*State v. Haggard,* 94 Idaho 249, 486 P.2d 260 (1971)

*See:* Federal Rules of Criminal Procedure, Rule 55(b)

"IX.

"BEFORE A FEDERAL CONSTITUTIONAL ERROR CAN BE HELD HARMLESS, THE COURT MUST BE ABLE TO DECLARE A BELIEF THAT IT WAS HARMLESS BEYOND A REASONABLE DOUBT.

*Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, *reh. den.* 386 U.S. 987, 87 S.Ct. 824 [1283], 17 [18] L.Ed.2d 705 [241] (1967)

*State v. LePage,* 102 Idaho 674, 630 P.2d 674 (1981)"

Accordingly it cannot be denied, and I would be the first to concede, that the office of the Attorney General has been extremely fair in recognizing and addressing the issues, the proper determination of which in this Court should result in the defendant being awarded a new trial.

The State is entirely right in declaring that instruction No. 21 both incorrectly stated the law of self-defense and confused the placing of the burden of proof. The State goes on, following the portion of its brief first above quoted, to say that "it was clear that Tolley, the victim, initiated the conflict." This, as the State sees it, rendered of no consequence the erroneous language of the instruction as to the law of self-defense. But here I am unable to agree. Everyone concedes that Carter acted in defense of himself, his wife, and his child, and that his family residence was invaded by an armed drunk, an obsessed Tolley who was intent on doing violence. The instruction, in all of its magnificent ambiguity, told the jury, at least as I read it, that Carter had to establish that he, the slayer, was *without fault "in bringing on the difficulty."* (Emphasis added.) Obviously, he was neither the immediate provoker nor the immediate aggressor. Not only is the instruction capable of being read as placing the burden of proving the defense of justifiable homicide upon the shoulders of the defendant, but he had to prove, if he could, that he was entirely without fault for the bad blood which culminated in the shooting affray. Moreover, it cannot be said, as the State urges, that other general instructions on burden of proof somehow cured the effect of this specific erroneous

instruction.[2] What this case was really all about was whether the defendant Carter acted unreasonably when his home was invaded by a violent-prone armed drunk bent on murder or mayhem. As fairly and squarely pointed out in the State's brief:

"In an apparent discussion of instruction number 21, the trial judge stated: 'That is the law. In other words, that is also what you have been trying to prove the last few days is that he wasn't the one that started it. It was the other guy that started it.' (Tr., p. 493, Ls. 16–19)."

Under that hypothesis, and the instruction which incorporated it, defendant had to exonerate himself from any responsibility for having started "the difficulty" in the first place. Proper inquiry would begin and end with the day Tolley appeared at the Carter home, armed, violent, and ready for combat. The law of Idaho declares that homicide is justifiable when (1) resisting an attempt to murder or do great bodily injury to any person, or, (2) when committed in defense of habitation, property or person against violence, or, (3) when committed in lawful defense of person, wife, or child, even when there is no show of violence—in which last instance only is there placed any obligation to in good faith endeavor to decline further conflict. I.C. § 18–1409.

The instruction was clearly wrong, prejudicial, and going to the very integrity of the jury's fact-finding function, cannot be considered harmless as the State suggests. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Moreover, the *Chapman* harmless error doctrine is also inapplicable unless an appellate court can declare, beyond a reasonable doubt, its conviction after a careful review of the entire record, that the evidence is overwhelmingly against the defendant that the error could not have contributed to the verdict. An examination of the evidence is in order.

The Court's opinion tells only this much: "[T]here was evidence from which the jury could have found that Tolley dropped his gun before entering the truck." Justice

Shepard in his September 1981 opinion wrote that "the record is totally devoid of any indication of how or when the gun was dropped at the position it was later found," and he points out that "the clear, unequivocal testimony of Carter is to the contrary, *i.e.,* that while the deceased was in the pick-up he was pointing a weapon at Carter." The prosecuting attorney in his opening address to the jury, after stating to them that Tolley did own and carry with him on that fateful day a .22 pistol, stated that when the police arrived there was that gun on the front lawn. He added his own surmise: "It may well be that Larry Tolley dropped that gun on the front lawn when he was hit by that first shotgun blast."

What is the fact of the matter? Much of the answer is found in a proper resolution of the impeachment issue, where Susan Carter's recollection of events was supposedly belittled by a Mr. Hanner with whom she had conversed immediately after the shoot-out.

Susan Carter, called to the stand *as a witness for the State,* testified to talking with Hanner immediately after the incident, first by telephone, and then at the Carter house. Her testimony, as State's witness, was that "I told him [Hanner] what I told you here." The supposed impeachment was a "no" answer to a double and perhaps quadruple question:

"Q. Mrs. Carter, on either the telephone call or the next day did you tell Mr. Hanner that you did not see a gun in Larry Tolley's hand at any time and the first time you saw the gun was when Joe Carter took it from the pickup and threw it on the lawn?

"A. No, I did not tell him that."

Hanner then testified, after admitting that he had heard her testimony concerning the incident:

"A. She said that she never seen a gun, that Larry hadn't had a gun. I asked her if Larry was shooting back at him because anybody that has got a gun

**2.** In opening his final summation, the prosecutor remarked disparagingly as to "the *defend-* *ant's claim* that he acted in self-defense." Tr., p. 504 (emphasis added).

and getting shot with a shotgun, you have got to shoot back.

"Q. What did she say?

"A. *She said that Joe did get a gun out of the car.* She didn't know whether he got it out of the glove box or under the seat." (Emphasis added.)

Clearly there were then two State witnesses corroborating Carter's version of the shooting when Tolley was in the pick-up—which was that Tolley still had his pistol—and explaining how it came to be found on the lawn when the police arrived. While Susan Carter *did* testify to her recollection that she saw Tolley with a gun when he first arrived, this was not an issue in the case. The State conceded Tolley owned and had with him the .22 pistol. A crucial issue was whether or not he had it in the pick-up when he received his final wounds from the antique shotgun. Her testimony on direct as Carter's witness, which she re-endorsed when called as a State's witness:

"Q. Did you then go in the house, Susan?

"A. Yes.

"Q. What occurred then?

"A. I looked out the window. There is a window right next to the door a foot and half or so and I looked out the window and I could see a trickle of blood on Larry's arm. Larry hopped inside the pickup and he still had the door open and he was behind the door on the seat sitting up and I could see a trickle of blood on his arm. Joe was—also I saw Bobbie Tolley as I was going in the door. I saw Bobbie Tolley go by in the car. I thought to myself: of course, because she would come right after Larry on other occasions. Joe jumped down and he ran toward Bobbie's car and he said, 'I just shot your husband, bitch.' I ran out because I didn't know what was going on and I put Jed down and ran out. Bobbie kind of stopped and then she took off. I ran back in the house and *Joe came running in* and there was a little ledge by the steps *and he grabbed two more shells* and I said, 'Is he hurt or is he dead or what?' I didn't know how Larry was. I was

concerned how Larry was and I didn't want to see anybody get hurt and Joe just ran right on out and I kind of went running out behind him. Well, not directly behind him. *He was down by the pickup by the time I got out.* I put Jed down in his room and I was trying to stay calm and trying to act like nothing happened to Jed, you know. I was even saying Jack and Jill Went Up the Hill to Jed.

"*So, Joe ran out and, so, Larry came up and Joe shot and jumped back and that was that.*

"Q. What did Joe do after that?

"A. Joe came running into the yard and he laid his gun down on the lawn.

"Q. Did he open up the door at that time, the car door?

"A. Not then. He threw his gun down on the lawn and he went back to the pickup truck and said, 'Larry, man, are you dead? I didn't want to shoot you.' *He went into Larry's car and came out with Larry's gun in his hand.* I said, 'Joe, what are you doing? Don't touch that, putting your fingerprints on that gun,' and he just kind of looked at me starting to go like this, you know, to rub it on his shirt and I said, 'Don't do that. You are rubbing Larry's prints off of that gun,' *and he just dropped it and he left it there* and just then Mrs. Merrill came by and he said, 'Call the police. There has been a man shot,' and she went down the road and Joe went the other way to Killians' house." (Emphasis added.)

Such is positive testimony that the gun was with Tolley when Carter approached the Tolley pick-up and explains how the pistol came to be where it was when the police arrived. Even more important is the testimony of Hanner corroborating Susan Carter's testimony, and hence the defendant's as well, that "*She said* [to Hanner] *that Joe did get a gun out of the car.*" Tr., p. 469.

Surely a Court which can with equanimity write that "there was evidence from which the jury could have found that Tolley dropped his gun before entering the truck,"

might spare a second of time to point to that evidence. It hasn't; I will. Deputy Sheriff Johnson did testify that after he arrived on the scene the defendant Carter volunteered that Tolley dropped his gun when he was first wounded, and that the same statement was repeated on questioning the next day at headquarters. However, not to be ignored is that Johnson only gave this testimony responsive to a leading and suggestive question and some time after the pistol had been admitted into evidence as an exhibit.

"Q. Did he make any more comments to you, Mr. Johnson, about Larry *Tolley's* pistol?

"A. At that time I don't believe so.

"Q. What *I am getting at was there any reference to Larry having dropped it?*

"A. *Yes.*" (Emphasis added.)

Making a jury's task even more difficult, Johnson, when recalled on State's rebuttal, under cross-examination gave testimony which clearly was in corroboration of Carter's testimony that he went to Tolley in the pick-up in order to both render first aid, and to relieve him of the gun.

"Q. Did you check the .22 out at Carter's place to see whether or not it was loaded or unloaded?

"A. No, I didn't.

"Q. You just picked up a gun that you didn't know was loaded or unloaded and put it in a bag?

"A. That's correct.

"Q. Do you think that is a safe procedure?

"A. I was the only one going to have access to the gun. I knew it was not in a position where it could fire and I feel it was safe, yes.

"Q. *Was there blood on the gun?*

"A. *Yes.*

"Q. *Do you know whose blood that was?*

"A. I have no idea.

"Q. You don't have any idea?

"A. *I have an idea, yes.*

"Q. Well, tell me whose idea.

"A. *Larry Tolley's blood.*

"Q. It wasn't Joe Carter's, was it?

"A. I don't believe so.

"Q. *So, that would indicate to you that the gun was in the pickup in his hand?*

"A. There was a question in my mind as to how the gun got there *where there was blood on the gun. There was no blood on the sidewalk. The only place there was any blood was around the pick-up.*

"Q. Did you make any blood test on the gun?

"A. No, sir. I could see no reason for it.

"Q. Because your conclusion was that it was Larry Tolley's?

"A. Right." Tr. pp. 481–82. (Emphasis added.)

Nor can one ignore that the prosecutor in his opening statement had surmised, as above, with regard to the pistol, and in advising the jury as to what Deputy Johnson would testify, made no mention that Johnson would tell them of Carter's volunteered statement.[3] Concededly it may have been oversight, and for certain it is not meant to here intimate that Deputy Johnson's testimony as to the volunteered statement was inaccurate. It is to suggest, however, that there was *not overwhelming evidence* of the defendant's guilt—*so much so that Justice Shepard on the one hand sees the evidence as insufficient to sustain a conviction.*

Justice Bakes, on the other hand, with two members of the Court joining his opinion, believes otherwise, but is perhaps not

---

**3.** The prosecutor informed the jury only that: "Deputy Johnson, of course, took the shotgun. He looked around and he noticed the pistol laying on the front lawn. Naturally that was later secured and you will see that as well. He found three spent shotgun casings that evening."

"Joe Carter was brought into the police station where he informed Deputy Johnson that some threats had been made and as a result of those threats he had killed Larry Tolley."

too conversant with the appeal record. Nothing therein sustains the Court in writing as it does that Tolley "retreated." Such is pure and unadulterated judicial fact-finding which may make a doubtful appellate decision more palatable. Rather than a "retreat" to the pick-up, the evidence is more capable of being understood as showing that Tolley "took cover" in his pick-up, leaving open for argument whether he did or did not still have his .22 pistol, and leaving for argument whether Carter did or did not know that Tolley in the pick-up had his .22 pistol or some other weapon. Obviously, and as the record shows, Tolley "jumping" into his pick-up was not incapacitated to the point of total disability where he could not carry out his voiced threat to do harm to Carter's wife or his one and a half year old son, or both. The prosecutor's main theory in final summation was that, based on medical testimony, Tolley was originally only wounded by pellets, none of which reached into any vital organ or artery, and that death was *solely* attributable to the shotgun blast into his face at close range while in the pick-up. These are all matters properly for the concern of a jury which decides such close issues *after a trial free from improper evidence and improper instructions.*

It is difficult to comprehend how the Court can steadfastly refuse to consider the fundamental error of instruction No. 21, notwithstanding that the State itself has raised the issue and since addressed it while reminding the Court that "[t]he obligation of the State to see that a defendant receives a fair trial is primary and fundamental."