Oleta O'Connor **YATES**, Appellant,

v.

**UNITED STATES** of America, Appellee.

No. 13527.

United States Court of Appeals
Ninth Circuit.

July 26, 1955.

See, also, 227 F.2d 848; 227 F.2d 851.

Margolis, McTernan & Branton, Los Angeles, Cal., for appellant.

Gladstein, Andersen & Leonard, San Francisco, Cal., Robert W. Kenny, Daniel Marshall, Los Angeles, Cal., amici curiae.

Laughlin E. Waters, U. S. Atty., Norman W. Neukom, Los Angeles, Cal., Lawrence K. Bailey, Washington, D. C., Ray H. Kinnison, Assts. U. S. Atty., Los Angeles, Cal., for appellee.

Before STEPHENS, FEE and CHAMBERS, Circuit Judges.

JAMES ALGER FEE, Circuit Judge.

Oleta O'Connor Yates was one of those indicted and on trial as a defendant on a charge of conspiracy to violate the Smith Act, 18 U.S.C.A. § 2385. After the close of the government case, all of the defendants rested except four, of whom Mrs. Yates was one. She was the only defendant there who testified. Yates v. United States, 9 Cir., 225 F.2d 146. Upon cross-examination she refused to answer any of four questions. Upon direction of the court to respond, she still refused. Thereupon, the trial judge signed a certificate with four specifications setting up the refusals. A judgment was entered committing her to the custody of the Marshal for imprisonment "until such time as she may purge herself of the contempts by answering the questions ordered to be answered in each instance or until further order of the court." Notice of appeal from this order of June 26, 1952, was immediately filed. Defendant Yates continued under cross-examination for three days, during which time she refused to answer other like questions. She continued in custody during the rest of the trial. Upon conviction in the conspiracy case, she was confined with the other defendants until August 30, 1952. All of the others were then released upon posting bail.

The Marshal refused to release Mrs. Yates until the judge then presiding gave a specific order releasing her until the matter could be heard by the trial judge who had committed her for contempt originally. On September 3, 1952, the minutes recite that "defendant is ordered back into physical custody of the U. S. Marshal pursuant to the order of June 26, 1952, re civil contempt" and that a bench warrant issue. This order was passed by Hon. William Mathes, who had presided at the original trial. An appeal was taken from this order. Pending hearing, this Court stayed execution on the order and relieved Mrs. Yates of recommitment.

The confusion as to meaning of words existing here is blameworthy. There is no essential dichotomy between "civil" and "criminal" contempt. The power of the court is inherent and can only be removed when the court is abolished. This prerogative is based upon the federal Constitution. When "inferior courts" are created by Congress, each possesses this authority by virtue of its existence. The Supreme Court has expressly held that coercive measures to superinduce obedience and penalties for defiance may be imposed by the same

court upon the same individual for the same act.[1] Indeed, the sanctions may be the same. Imprisonment which involves deprivation of personal freedom is applied indifferently. A fixed term or an indefinite one which might last longer seems to make no distinction of practical value to a prisoner. The judge might well take steps to release one no longer defiant who had been sentenced to a fixed term. Even the unexpressed purpose of the judge to coerce or punish is no test. As the maxim of equity, it serves the purpose of all who appeal to it. If we become involved in the bog of signification of phrases, the clear way will be lost.

■■■■ Where the United States is prosecuting a criminal case, and a defendant as a witness refuses to answer after order by the court, it seems a contradiction in terms to call the refusal a "civil" contempt. The defiance of the order is committed in the face of the court. Procedural safeguards are thus unavailable and unnecessary.[2] The power of the court to proceed in an orderly manner is cardinal. The right of a defendant to testify in his own defense was formerly denied by the criminal courts of common law. Now, if he voluntarily takes the stand, under elaborate safeguards to prevent a coerced consent, a defendant may tell his own story in his defense. But this privilege, of inestimable value, is accorded upon the condition that he be cross-examined. Whether the purpose of the judge then be coercion or retribution, where a defendant has abused this privilege by refusal to testify in a criminal trial, the vindication of the authority of the tribunal is essential. The sanction, whether indefinite in duration or fixed in time, under such circumstances, has a strong flavor of punishment.

■■■■ As to the primary order, there is no question. The trial court was well within the channels of power. It would be subversive of our system of trials, where a defendant is not compelled to testify, to permit him to testify voluntarily to that which he wishes and on the other hand refuse to answer on cross-examination any question which he might believe embarrassing. He cannot be compelled to testify at all. No comment upon his failure to testify can be made by the prosecution—a feature which we sincerely hope is never eliminated from the federal system. But, where one waives this immunity and voluntarily gives testimony he should not be permitted to pick and choose that which he will answer.

The questions here propounded were material, if not vital, to the main issue of conspiracy. Mrs. Yates had fair opportunity to answer, was expressly warned and refused with full knowledge of the consequences. The confinement as a result was proper exercise of the authority of the trial judge. The order of June 26, 1952, was valid.

It has, however, been now called to our attention that the trial at which the witness was ordered to testify has ended. This circumstance highlights the situation in the second appeal which was taken from the order of September 8, 1952, directing that Mrs. Yates be recommitted to custody, in accordance with the previous order, based upon the continued failure to testify. Termination of the original proceeding was a circumstance requiring consideration by the trial court before further action was taken. All concepts of the common law indicate a criminal trial is an entity. From ancient times, it was a proceeding before one judge and one jury. Even modernly, it has been held that the same

---

1. United States v. United Mine Workers, 330 U.S. 258, 296, 300, 67 S.Ct. 677, 91 L.Ed. 884.

2. Of course, no such problem was here involved as developed in Offutt v. United States, 348 U.S. 11, 75 S.Ct. 11.

judge was an essential to a criminal trial and another could not be substituted by consent of defendant and his counsel.[3] The doctrine of waiver has been invoked to permit less than the mystic twelve to sit as jurors and for substitutions of jurors to be made. It was not the avowed intention to change the guaranties by these innovations, and certainly no argument can be drawn that due process was subverted thereby.

■ In any event, once a verdict is returned and the jury is discharged, the trial is ended. Once so concluded, a trial is ended forever. The situation can never be recreated. This defendant, or some of the defendants or other people, may be retried on the same charge by the same judge and the same jury, but the trial is not the same. It is true that, if we followed the analogies of civil cases, in which coercive measures in order to enforce the mandates of the court have been employed, the principle which was followed by the trial judge here would rule the proceeding.[4] So long as the private litigant, including the United States as a plaintiff in a civil case, can gain by coercive measures, the court is at liberty to use them even though the immediate trial may have come to an end.[5]

The trial court recognized that the only cases which involve this peculiar situation of prosecution by the United States are contrary to the position taken in this case. Where a witness has been called to testify before a grand jury and

the grand jury has been discharged,[6] the use of coercive measures upon the witness would be erroneous. The reason for this is obvious enough. The grand jury has gone out of session. The proceeding before the same body cannot be revived. If the witness were ordered to testify or wished to testify, there is no body before which the testimony could be received. Even if it were postulated that these answers were part of the original cross-examination, since the jury was discharged, the guarantee of the Constitution would apply to an answer then compelled. It is probable that the force of the oath which she took in that proceeding had been extinguished by the discharge of the jury. While it is true that perhaps the court might accept the acquiescence of the witness in giving the information under oath as a purging of the contempt, the situation cannot be re-created. This ending may be likened to the fall of the bridge. The bridge may be rebuilt, but it is not the same bridge. All the orders of a court requiring a person to cross the first bridge are vain once it has been swept away. The problem is more baffling than that faced by all the King's horses and all the King's men. This situation is even more dramatic in the trial of a defendant in a criminal case. There, concepts of jeopardy have sway.

■ This Court recognizes that the answers to the questions by Mrs. Yates may still be of great importance to the government of the United States in this

3. Freeman v. United States, 2 Cir., 227 F. 732.

4. Even in the cases where coercion is the entire objective, care must be exercised that the proceedings out of which the necessity for compulsion arose shall not have terminated. For even there, if the main proceeding is ended, the contempt is abated. Harris v. Texas & Pacific Railway Co., 7 Cir., 196 F.2d 88, 90; Parker v. United States, 1 Cir., 153 F.2d 66, 71, 163 A.L.R. 379; United States v. International Union, 88 U.S.App.D.C. 341, 190 F.2d 865, 874. And see United States v. United Mine Workers of America, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884; Gompers v. Bucks Stove & Range

Co., 221 U.S. 418, 451, 31 S.Ct. 492, 55 L.Ed. 797.

5. The distinction lies in the continuance of the duty. The requirement that one produce records for an administrative body may be of indefinite continuance. No case has been cited to us indicating that the duty of a witness to answer even in a civil case extends beyond the discharge of the jury in the particular case.

6. Howard v. United States, 8 Cir., 182 F. 2d 908, 914, reversed on other grounds 340 U.S. 898, 71 S.Ct. 278, 95 L.Ed. 651; Loubriel v. United States, 2 Cir., 9 F. 2d 807, 809; United States v. Collins, D. C., 146 F. 553, 554.

or other future criminal prosecution. It might be of great advantage if there were a retrial to have the information. Her attitude was contemptuous and defiant.[7] But, after the end of the trial, it was error to attempt to coerce this witness into testifying before a jury which had been disbanded and could not be legally recalled.

The order of June 26, 1952, was valid and is affirmed. It was error, however, to direct confinement thereunder after the close of the main trial. The order of September 8, 1952, is reversed.

STEPHENS, Circuit Judge.
I concur in the result.

---

7. Even though the "petitioner * * * carries the key of his prison in his own pocket" and "can come out, when he will", In re Nevitt, 8 Cir., 117 F. 448, 461, does not render it less erroneous for the court to recommit when the duty to answer has been dissipated by discharge of the trial jury.