658 P.2d 920

**STATE of Idaho, Plaintiff-Respondent,**

v.

**Syd TALMAGE, Defendant-Appellant.**

No. 13344.

Supreme Court of Idaho.

Jan. 31, 1983.

**250**

William B. Taylor, Jr., Grangeville, for defendant-appellant.

David H. Leroy, Atty. Gen., Lynn E. Thomas, Sol. Gen., Lance D. Churchill, Deputy Atty. Gen., Boise, for plaintiff-respondent.

BAKES, Justice.

This is an appeal from a judgment of conviction for first degree burglary, in violation of I.C. § 18–1401.

The defendant appellant was apprehended inside a drug store in Cottonwood, Idaho. The State of Idaho filed a criminal complaint against the defendant appellant on June 26, 1978, charging him with the crime of burglary in the first degree. The defendant testified in his own behalf at his first trial on September 14, 1978, to the effect that a person whom he refused to identify had informed him of a store owner in Cottonwood, Idaho, and that upon contacting the store owner he was hired to break into the store and "make it appear that someone had been searching, you know, mess the place up, go through things." On cross examination, however, the defendant, relying on the fifth amendment, refused to identify who had initially informed him of the job. The court ruled that the defendant had opened the subject on direct examination, that he had waived his right to remain silent and ordered the defendant to answer. When the defendant remained adamant in his refusal, the court proceeded with the trial, stating that the problem would be dealt with at the trial's conclusion. The case was submitted to the jury, which returned to the courtroom after several hours of deliberation and reported that it was unable to reach a verdict. The court instructed the jury to deliberate further, but the jury again returned and the foreman reported that the jury was deadlocked and that further deliberations would be of no use. The court, on its own motion, declared a mistrial and subsequently set a second trial for October 16, 1978.

Before the second trial, on September 25, 1978, the court held a contempt hearing during which the defendant was given another opportunity to answer the questions asked of him during cross examination. The trial court warned the defendant that failure to answer the questions would subject him to a contempt charge and incarceration until he chose to answer. When defendant again refused to answer, the court, by its order filed October 16, 1978, but dated September 25, 1978, found him in contempt of court and sentenced him to the custody of the sheriff until he "indicate[d] a willingness to answer under oath the questions which the court directs him to answer, or until further order of this court."

Upon motion by the defendant, the court, finding that the defendant "had an ongoing duty to answer certain questions . . . ," but that "it is apparent that defendant ha[d] no intention of complying with the order of the Court . . . ," entered its Order Terminating Contempt Order on April 6, 1979. Defendant filed various motions on April 13, 1979, including motions to dismiss based on allegations that he had been denied a speedy trial and placed in double jeopardy. The trial court denied these motions and a second trial was held on April 30, 1979, at which time the defendant was found guilty of first degree burglary. The defendant appeals his conviction, alleging that he was denied a speedy trial and that the second trial subjected him to double jeopardy, both in violation of his constitutionally guaranteed rights. Finding no such violations, we affirm.

I

Relying specifically on Art. 1, § 13, of the Idaho Constitution, defendant appellant argues that he was denied a speedy trial in conjunction with the second trial held. Ida-

ho Constitution Art. 1, § 13, guarantees criminal defendants the right to a speedy trial as follows:

"In all criminal prosecutions, the party accused shall have the right to a speedy and public trial . . . ."[1]

The defendant claims that he was deprived of a constitutionally guaranteed speedy trial by the trial court's failure to retry him on October 16, 1978, the date originally set for the second trial, allowing approximately 7½ months to elapse before holding the second trial on April 30, 1979.

■ The state, in its brief on appeal, argues that under the provisions of I.C. § 19–3501 good cause existed for the delay, and defendant was not denied a speedy trial. Prior to the time period relevant to this action, Idaho Constitution Art. 1, § 13, was supplemented by I.C. § 19–3501 which provided definition of the concept of "speedy trial." *See State v. Hobson,* 99 Idaho 200, 579 P.2d 697 (1978); *Jacobson v. Winter,* 91 Idaho 11, 415 P.2d 297 (1966). I.C. § 19–3501 required that a criminal action be dismissed if the defendant was not tried during the *next term of court* after the information was triable, unless good cause to the contrary was shown. *State v. Hobson, supra* at 202, 579 P.2d at 699 (1978); *see State v. Lindsay,* 96 Idaho 474, 531 P.2d 236 (1975).[2] Effective March 1, 1975, however, the Idaho legislature repealed I.C. § 1–706 which required at least two court terms per year in each county. 1975 Idaho Sess.Laws ch. 242, § 1, in response to this Court's promulgation of I.R. C.P. 77(a), effective January 1, 1975, which abolished terms of court. While I.R.C.P. 77(a) did not expressly apply to criminal cases, the action of the legislature in repealing I.C. § 1–706 was general and applied to both civil and criminal actions. Therefore, the action of the legislature in repealing I.C. § 1–706, and the action of this Court in promulgating I.R.C.P. 77(a) precludes the determination of the right to a speedy trial by reference to the terms of court for cases filed after the effective date of the repeal of I.C. § 1–706. *State v. Carter,* 103 Idaho 917, 655 P.2d 434 (1981).

■ This Court, in *State v. Lindsay,* 96 Idaho 474, 475, 531 P.2d 236, 237 (1975), noted the following in regard to the Idaho constitutional guarantee of speedy trial:

"The right of speedy trial as guaranteed by a state constitution or statute cannot be said to be necessarily identical to that right to speedy trial guaranteed in the Constitution of the United States. We find, however, that the 'balancing test' laid down in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), is consistent with decisions of this court stating that whether one has been deprived of his right to a speedy trial must be decided by reference to considerations in addition to the mere passage of time. *Hadlock v. State,* 93 Idaho 915, 478 P.2d 295 (1970); *Ellenwood v. Cramer,* 75 Idaho 338, 272 P.2d 702 (1954)."

*Accord, State v. Holtslander,* 102 Idaho 306, 308–09, 629 P.2d 702, 704–05 (1981). The "balancing test" enunciated by the United States Supreme Court in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), referred to above, is a four-fold balancing test determinative of whether an accused has been denied a speedy trial. The factors to be considered are: (1) the length of delay; (2) the reason(s) for delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant occasioned by the delay. *State v. Holtslander,*

---

1. The sixth amendment to the United States Constitution provides the following similar protection: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, . . . ."

2. The legislature amended I.C. § 19–3501 in 1980 to read:

"19–3501. WHEN ACTION MAY BE DISMISSED.—The court, unless good cause to the contrary is shown, must order the prosecution or indictment to be dismissed, in the following cases:

. . . .

"2. If a defendant, whose trial has not been postponed upon his application, is not brought to trial within six (6) months from the date that the indictment or information is filed with the court." 1980 Idaho Sess.Laws, ch. 102, § 1.

*supra* at 309, 629 P.2d at 705; *State v. Lindsay, supra* at 476, 531 P.2d at 238; *see Barker v. Wingo, supra.*

The interval between the first and second trials in this action, the delay of which defendant complains, was approximately seven and one-half months. A delay of this length is sufficient to trigger our inquiry into whether a defendant has been denied a speedy trial. *See State v. Holtslander, supra.* Compared to the delays alleged to have constituted a denial of speedy trial in other actions before this Court, however, this seven and one-half month period intervening between the trials is not in itself so excessive as to outweigh the other balancing factors. *See, e.g., State v. Holtslander, supra* (elapse of nine months between date original complaint was filed and arrest not inordinate); *State v. Lindsay, supra* (fourteen month interval between filing complaint and trial, when balanced against other factors, did not constitute denial of speedy trial).

Turning to the reason for the delay, it is apparent that the prosecution did not deliberately attempt to defeat the defendant's right to speedy trial; indeed, counsel for the defendant acknowledges in his brief on appeal that the prosecution was prepared to go to trial on October 16, 1978, the date originally scheduled for the second trial. On the other hand, more than six months of the seven and one-half month period between the defendant's trials can be attrib-

uted to the defendant's refusal to answer the questions asked of him on cross examination relating to his testimony on direct during the first trial and the ensuing contempt and commitment proceeding and order issued against the defendant. The trial court's Order and Commitment was to be effective only until the defendant indicated a willingness to answer, at which time defendant was to be returned to open court. Therefore, the defendant held the key to his own speedy retrial and the reason for the greatest portion of the delay between the first and second trials, the defendant's willful disobedience of the trial court's order to answer certain questions, should not be weighed against the state.[3]

Furthermore, the defendant did not assert his right to speedy trial until he filed his Motion to Dismiss on that ground on April 13, 1979, just two and one-half weeks prior to his second trial. At the contempt hearing held on September 25, 1978, the defendant's counsel stated that the defendant did not waive his right to speedy trial; nevertheless, defendant waited some six months to assert his right.

Finally, the defendant has not alleged or shown that he was prejudiced by the delay between the first and second trials, nor does the record reflect that his ability to present his defense was impeded in any way. Although this Court has previously stated that "[i]f [a] defendant can show an unreasonable delay in prosecution, prejudice is pre-

3. The defendant asserts that the trial court's contempt and commitment order violates the standard established in *Yates v. United States,* 227 F.2d 844 (9th Cir.1955), *cert. granted,* 350 U.S. 947, 76 S.Ct. 322, 100 L.Ed. 825 (1956), and was therefore an invalid justification for the delay between trials. The court in *Yates* held that imprisonment cannot be used to coerce evidence after the trial has terminated. *See also Yates v. United States,* 355 U.S. 66, 78 S.Ct. 128, 2 L.Ed.2d 95 (1957); *Shillitani v. United States,* 384 U.S. 364, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966). Litigation, however, is not completed under the *Yates* standard when a trial court declares a mistrial on the ground that the jury is deadlocked, and the case before us is distinguishable from *Yates* on that basis. This action was not ended, as the declaration of mistrial necessitated a retrial at which the same issues would be litigated.

Since the action had to be retried, the trial court had authority to hold the contempt hearing subsequent to the mistrial and give the defendant another opportunity to purge himself of his refusal to comply with the court's order. When the defendant remained steadfast in his refusal, the court had authority to punish his contempt by way of commitment. Whether the court should have penalized defendant by incarcerating him for a fixed term rather than "until he indicated a willingness to answer," is a question that could and should have been raised in a *habeas corpus,* not collaterally in this proceeding. Disobedience of the trial court's order was contemptuous, regardless of the correctness of that order. *Cf. Barnett v. Reed,* 93 Idaho 319, 460 P.2d 744 (1969) (disobedience of court order constitutes contempt regardless of correctness of order); *Mathison v. Felton,* 90 Idaho 87, 408 P.2d 457 (1956).

sumed," *Olson v. State,* 92 Idaho 873, 874, 452 P.2d 764, 765 (1969), *citing Richerson v. State,* 91 Idaho 555, 428 P.2d 61 (1967), we have more recently adopted the view that "prejudice is a central factor in analyzing the right to speedy trial." *State v. Holtslander, supra* at 313, 629 P.2d at 709. In *Holtslander,* we held that "where a defendant does not even attempt to make a showing of reasonable possibility of prejudice, then this factor should be given very little weight, if any, for the defendant. *Supra* at 313, 629 P.2d at 709.

In applying the facts of this case to the balancing test, the four factors, particularly the reason for the delay, weigh against the defendant. On the basis of this record, the scale being demonstrably tipped in favor of the state, we hold that the defendant was not deprived of a speedy trial.

■ Even if the record established that the seven and one-half month delay constituted a denial of speedy trial, delays in bringing a defendant to trial caused or consented to by the defendant are considered to constitute waiver of the right to be tried within the time affixed by statute or required by constitution. *Accord, State v. Wilbanks,* 95 Idaho 346, 509 P.2d 331 (1973); *Hadlock v. State,* 93 Idaho 915, 478 P.2d 295 (1970); *Olson v. State,* 92 Idaho 873, 452 P.2d 764 (1969); *Ellenwood v. Cramer,* 75 Idaho 338, 272 P.2d 702 (1954): *see also Balla v. State,* 97 Idaho 378, 544 P.2d 1148 (1976). As discussed above, the greatest portion of the delay between the two trials was caused by defendant's refusal to answer the questions asked of him on cross examination and the resulting contempt order. Therefore, the delay in this case was attributable to the defendant and he thereby waived any right to complain of the lack of a speedy trial as it related to the second trial.

## II

■ The double jeopardy clauses of the fifth amendment of the United States Constitution, applicable to the states through the due process clause of the fourteenth amendment, and Art. 1, § 13, of the Idaho Constitution, protect a criminal defendant from repeated prosecutions for the same offense. Defendant claims that he was placed in double jeopardy when the trial court retried him for the same charges at issue in the first trial. The defendant claims that "the trial Court did not make sufficient inquiry of the jury, through its foreman to establish a *manifest necessity* to discharge the jury . . . ," and thereby overcome the constitutional objection of double jeopardy upon retrial.

In this action, the jury retired to deliberate at approximately 7:30 p.m. on September 15, 1978. At the jury's request, it returned to the courtroom at approximately 11:19 p.m., and the court gave an additional instruction and encouraged the jury to deliberate further in an attempt to reach a verdict. The jury was excused to resume deliberations but returned approximately forty minutes later, at 12:05 a.m. on September 16, 1978, and the following colloquy ensued:

"THE COURT: All right. The record will show all members of the jury are present. Mr. Fitting, are you still unable to reach a verdict in this case?

"JURY FOREMAN: Yes.

"THE COURT: I take it then that the problem that you have is not one of a question about the law or the instructions that I have given the jury. If it is a question about that, if there is any additional instruction or clarification of the instruction, I would be prepared to do that. If it's not a case of that, I would like to know.

"JURY FOREMAN: We are in doubt of the charges against the Defendant.

"THE COURT: All right. Then it is a question that you cannot agree upon the facts?

"JURY FOREMAN: That's right.

"THE COURT: Of the evidence—the evidence establishes? All right. Well, the hour is very late. You have been deliberating a long time and I know you have given this a lot of consideration. Now, I just for the record to determine if in your opinion it would do no use to deliberate

any further in this case; is that the situation?

"JURY FOREMAN: That is it.

"THE COURT: All right. The Court has no choice then but to declare the jury deadlocked, unable to reach the verdict and therefore I will on that ground declare a mistrial....."

In the recent case of *Oregon v. Kennedy*, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), the United States Supreme Court stated that "the classical test for lifting the double jeopardy bar to a second trial is the 'manifest necessity' standard ..." and that "the most common form of 'manifest necessity' [is] a mistrial declared by the judge following the jury's declaration that it was unable to reach a verdict." *Oregon v. Kennedy*, 102 S.Ct. at 2087. The court further stated that "the hung jury remains the prototypical example" of meeting the manifest necessity standard, citing *Arizona v. Washington*, 434 U.S. 497, 509, 98 S.Ct. 824, 832, 54 L.Ed.2d 717 (1978), and *Illinois v. Somerville*, 410 U.S. 458, 463, 93 S.Ct. 1066, 1070, 35 L.Ed.2d 425 (1973). *Id. See also United States v. Larry*, 536 F.2d 1149 (6th Cir.1976), *cert. denied*, 429 U.S. 984, 97 S.Ct. 502, 50 L.Ed.2d 595 (1976).

■ We adhere to the view that it is within the sound discretion of the trial court to declare a mistrial in the interests of justice. *Accord Gori v. United States*, 367 U.S. 364, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1961); *Lewis v. Anderson*, 94 Idaho 254, 486 P.2d 265 (1971); *State v. Cypher*, 92 Idaho 159, 438 P.2d 904 (1968): *see State v. Owens*, 101 Idaho 632, 619 P.2d 787 (1979); *State v. Lopez*, 100 Idaho 99, 593 P.2d 1003 (1979). A trial court's exercise of its discretion will not be reversed on appeal "unless it clearly appears that the trial court abused its discretion, and a party's rights were thereby prejudiced." *State v. Cypher, supra* 92 Idaho at 165, 438 P.2d at 910. In this action the jury deliberated for a total of more than four hours. Returning to court for the second time, the jury foreman indicated that it would be useless to deliberate further. At that late hour, the trial

court, in its discretion, determined that the jury was hopelessly deadlocked and declared a mistrial. This is not a case of "overworking jurors at the expense of those jurors ... with [a] resultant unfair trial," *State v. Silcox*, 103 Idaho 483 at 492, 650 P.2d 625 (Idaho 1982) (Bistline, J., dissenting). The trial court did not abuse its discretion in declaring mistrial and the retrial violated no constitutional guarantee. *See United States v. Larry, supra.*

Finding that neither of defendant's rights to speedy trial or against double jeopardy were violated, we affirm the conviction entered in the second trial.

DONALDSON and SHEPARD, JJ., and McFADDEN, J. (Ret.), concur.

BISTLINE, Justice, dissenting:

The Court today holds that defendant's retrial seven and one-half months after a mistrial was declared by the trial court did not abridge defendant's right to a speedy trial or place him in double jeopardy. On the state of the record I am unable to agree.

## I. DOUBLE JEOPARDY

Article 1, section 13 of the Idaho Constitution provides that: "No person shall be twice put in jeopardy for the same offense, ...." This provision precludes a retrial of an accused upon declaration of a mistrial *unless* there is a "manifest necessity" for the trial court to declare the initial mistrial. "Manifest necessity" for the declaration of a mistrial may be found in the inability of a jury to reach a verdict. *United States v. Larry*, 536 F.2d 1149 (6th Cir.1976). However, if a mistrial is improperly declared, appellant's retrial is violative of his right not to be subjected to double jeopardy. *Id.* The "manifest necessity" test was formulated by the United States Supreme Court in *United States v. Perez*, 22 U.S. (9 Wheat) 579, 6 L.Ed. 165 (1824), where a jury was discharged in a capital case without defendant's consent. The Court there stated:

"We think, that in all cases of this nature, the law has invested courts of justice

with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances which would render it proper to interfere. *To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; . . . .*" *Id.* at 580, 6 L.Ed. at 165 (emphasis added).

More recently the Supreme Court said in *Downum v. United States,* 372 U.S. 734, 736, 83 S.Ct. 1033, 1034, 10 L.Ed.2d 100, 102–03 (1963), that:

"At times the valued right of a defendant to have his trial completed by the particular tribunal summoned to sit in judgment on him may be subordinated to the public interest—*when there is an imperious necessity to do so. . . .* Differences have arisen as to the application of the principle. . . . Harassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict are examples when jeopardy attaches. . . . But those extreme cases do not mark the limits of the guarantee. The discretion to discharge the jury before it has reached a verdict is to be exercised '*only in very extraordinary and striking circumstances,*' to use the words of Mr. Justice Story in *United States v. Coolidge,* 25 Fed.Cas. 622, 623." (Emphasis added.) (Citations omitted.)

In *United States v. Larry, supra,* 536 F.2d at 1153, the court looked at the following factors in determining that there was a "manifest necessity" for declaration of a mistrial:

(1) The issue for the jury's consideration was a simple one.

(2) The jury deliberated over a two-day span, as a net result of which was the propounding of questions to the court having no reasonable bearing on the matter of the defendant's guilt or innocence.

(3) The trial judge made repeated inquiry of the foreman as to the jury's potential of reaching an agreement.

(4) The trial judge was informed that the jury had made no progress at all in their deliberations and that the division within the jury had not changed since the outset of the deliberations.

(5) There was not the slightest doubt or equivocation expressed by the foreman regarding the jury's deadlock, nor did any of the jurors seated in the jury box indicate any different view.

A mistrial was declared in the present case by the trial court after the jury had deliberated for just over four and one-half hours. The time was five minutes past midnight. The short colloquy between the trial judge and the jury foreman which resulted in a declaration of mistrial is virtually self-explanatory.

"THE COURT: All right. The record will show all members of the jury are present. Mr. Fitting, are you still unable to reach a verdict in this case?

"JURY FOREMAN: Yes.

"THE COURT: I take it then that the problem that you have is not one of a question about the law or the instructions that I have given the jury. If it is a question about that, if there is any additional instruction or clarification of the instruction, I would be prepared to do that. If it's not a case of that, I would like to know.

"JURY FOREMAN: *We are in doubt of the charges against the Defendant.*

"THE COURT: All right. *Then it is a question that you cannot agree upon the facts?*

"JURY FOREMAN: That's right.

"THE COURT: Of the evidence—the evidence establishes? All right. Well, *the hour is very late.* You have been deliberating a long time and I know you have given this a lot of consideration. Now, I just for the record to determine if in your opinion it would do no use to deliberate any further in this case; is that the situation?

"JURY FOREMAN: That is it.

"THE COURT: All right. The court has no choice then but to declare the jury deadlocked, unable to reach the verdict and therefore I will on that ground declare a mistrial." (Emphasis added.)

It is evident that the trial court did not make sufficient inquiry of the jury, through its foreman, to establish a "manifest necessity" to discharge the jury. When the foreman stated the jury's doubt as to the charges against the defendant, which is at the least ambiguous as to meaning, the court instead of seeking clarification suggested that the problem was an inability to agree upon the facts. An obliging foreman answered in the affirmative, true, but it appears that the foreman and the judge were at cross-purposes—the foreman saying "charges" and the judge saying "facts." As any practitioner well knows, jurors stand somewhat in awe of judges and often have to be drawn out in order to ascertain what it is they are trying to say in a foreign legalistic world. If attorneys hesitate to correct a judge, a juror is less apt to. A better practice, and one most attorneys have observed, is for enough communication to ascertain to some degree the nature of the problem and the severity of it. It is not unlikely that the uncertain remarks of the foreman did not represent the message which the other jurors wanted conveyed to the judge, and many judges would ascertain from the other jurors if the foreman spoke for all. Jurors simply are not ordinarily going to volunteer anything. Especially when it is after midnight and most have legitimate reasons for being home.

This entire problem might have been averted had the trial judge, instead of sending the jury out at 7:30 p.m. to arrive at a verdict, excused them for the evening to resume their deliberations on the morrow with a fresh mind. I continue to adhere to the views I expressed in *State v. Silcox,* 103 Idaho 483, 492, 650 P.2d 625, 632 (1982):

"[J]urors have been statutorily accorded certain rights, and ... a denial of those jurors' rights works a denial of an accused's fundamental right to a fair trial. In *[State v.] Hernandez* [102 Idaho 349, 630 P.2d 141 (1981)] the involved juror's right was to not be denied a rereading of all—rather than certain—testimony which he wanted. In this case the involved juror's right was the right to pass upon an accused's guilt or innocence, absent any improper coercion from the trial court and not being caused to so deliberate at a time when the minds of most people are at rest. Just as I.C. § 19-2204 in terms absolutely mandatory entitles a jury to further information on a point of law or clarification of testimony, so does I.C. § 19-2202 mandate that the sheriff must, while the jury are kept together during the trial, or during their deliberations, provide them 'with suitable and sufficient food and lodging.' Clearly the statute contemplates that jurors entrusted with the awesome responsibility of deciding whether an accused shall go to prison are entitled to work at their task a normal day, and are entitled to have, and know that they have, a lodging for the night so that they may on the ensuing day resume their deliberations with some degree of vim, vigor, and vitality. Clearly this juror's right was in this case wholly disregarded. Nothing in the record intimates in the slightest that the jury was informed of their right to hang it up for the night and stay at suitable lodging which the sheriff would furnish for them, and at county expense. Under these unique, and one would hope unprecedented, circumstances the jury was put to deliberating when it better would have been put to bed so as to be fresh for final summations and the reading of the Court's instructions on the law."

Jurors are people, and as such do tire. Not knowing or being advised that they were entitled to food and lodging at public expense for the evening so they might approach their task on the following day, it is easy to see why nothing was voluntarily stated. Trial judges also tire. Such is evidenced by the following colloquy entered into between the trial judge and defendant's attorney at 11:15 p.m.

"THE COURT: ... [T]he jury has sent out word that they have a problem that they felt needed to be brought to the attention of the Court. So I am going to have them brought in and discuss this very briefly with them to confirm the nature of the problem and see if the Court can give them any further instructions that will help them in reaching a verdict.

"MR. LONGETEIG: ... We would object to the giving [of a further instruction] at this point and we would suggest it not be given and the jury be allowed to deliberate or in the alternative the jury be allowed to recess for the evening and allowed to come back and deliberate when they are more rested. The day has been long, it's been a two day trial, especially today. They are undoubtedly very tried. We feel perhaps a more dispassionate and considerate judgment could be given with a nights sleep.

"THE COURT: Well, I would—I would feel that to allow the jury to separate tonight would be creating both legal problems for the continuation of this trial and possibly some other problems that inject complications into this case and I am going to follow this procedure first. I will determine after the jury is in whether I will give them this instruction that I have shown to both counsel. All right, would you have the jury come in, please."

The court then gave the jury this instruction which clearly advised them that after just one more vote they would be discharged:

"I have only one request of you, by law I cannot demand this of you, but I want you to go back into the jury room, then taking turns, tell each other, tell each of the other jurors the weakness of your own position that you can see. You should not interrupt each other or comment on each other's views until each of you have had a chance to talk.

"After you have done that, if you have not already done that, if you simply cannot reach a verdict, then return to the courtroom and I will declare this case mistried and will discharge you with my sincere appreciation for your services.

"You may now retire to continue with your deliberations until you feel that you should inform the Court again of the results of those deliberations."

Unlike the trial judge in *United States v. Larry, supra,* here no inquiry was made to ascertain whether there had been any movement in one direction or another nor was there otherwise any inquiry into the circumstances of the jury's deadlock. Under these circumstances it is apparent that a weary trial judge did not use his power to declare a mistrial "with the greatest caution, under urgent circumstances [or] for very plain and obvious causes" as is required by the test set forth in *United States v. Perez,* 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165, 165 (1824). Nor can it be said that this case presented "very extraordinary and striking circumstances" as is required by the test set forth in *Downum, supra.*

## II. SPEEDY TRIAL

The Court today holds that defendant's retrial seven and one-half months after his original trial did not violate his right to a speedy trial because, so it is said,

"the defendant held the key to his own speedy retrial and the reason for the greatest portion of the delay between the first and second trials, the defendant's willful disobedience of the trial court's order to answer certain questions, should not be weighed against the state."

It is a well-established rule that a trial court's authority to order an individual, not necessarily a criminally accused defendant, to testify terminates when the hearing or trial is terminated. This issue was laid to rest by the Ninth Circuit in *Yates v. United States,* 227 F.2d 844, 845 (9th Cir.1955), (rev'd on other grounds, 355 U.S. 66, 78 S.Ct. 128, 2 L.Ed.2d 95 (1957)), where Yates was imprisoned "until such time as she may purge herself of the contempts by answering the questions ordered to be answered in each instance or until further order of the court." Yates remained in custody under

this order during the rest of the trial which resulted in the conviction of all of the defendants. The other defendants were then released upon posting bail pending appeal, but Yates was held in custody under the contempt order. Yates then appealed the contempt order to the Circuit Court. Upon appeal the Ninth Circuit Court reversed the contempt order stating:

"[O]nce a verdict is returned and the jury is discharged, the trial is ended. Once so concluded, a trial is ended forever. The situation can never be recreated." 227 F.2d at 847.

The Ninth Circuit Court then reasoned: "Even if it were postulated that these answers were part of the original cross-examination, since the jury was discharged, the guarantee of the Constitution would apply to an answer then compelled. It is probable that the force of the oath which she took in that proceeding had been extinguished by the discharge of the jury. While it is true that perhaps the court might accept the acquiescence of the witness in giving the information under oath as a purging of the contempt, the situation cannot be recreated. This ending may be likened to the fall of the bridge. The bridge may be rebuilt, but it is not the same bridge. All the orders of a court requiring a person to cross the first bridge are vain once it has been swept away. The problem is more baffling than that faced by all the King's horses and all the King's men. This situation is even more dramatic in the trial of a defendant in a criminal case. There, *concepts of jeopardy have sway.*" 227 F.2d at 847 (emphasis added).

The court concluded:

"This Court recognizes that the answers to the questions by Mrs. Yates may still be of great importance to the government of the United States in this or other future criminal prosecution. It might be of great advantage if there were a retrial to have the information. Her attitude was contemptuous and defiant. But, *after the end of the trial, it was error to attempt to coerce this witness into testi-*

*fying before a jury which had been disbanded and could not be legally recalled.*" 227 F.2d at 847–48 (emphasis added).

An attempt has been made by this Court to dispose of such clear authority by a supposed distinction:

"Litigation, however, is not completed under the *Yates* standard when a trial court declares a mistrial on the ground that the jury is deadlocked, and the case is distinguishable from *Yates* on that basis. The action was not ended, as *the declaration of mistrial necessitated a retrial* at which the same issues would be litigated." Footnote 3, Court's Opinion (emphasis added).

The *Yates* court addressed that exact proposition to the contrary in the last excerpt above set forth. The Court, I fear, mistakes the law governing coercive imprisonment. In an analogous case, the United States Supreme Court stated:

"[T]he justification for coercive imprisonment as applied to civil contempt depends upon the ability of the contemnor to comply with the court's order. . . . Where the grand jury has been finally discharged, a contumacious witness can no longer be confined since he then has no further opportunity to purge himself of contempt. . . . Once the grand jury ceases to function, the rationale for civil contempt vanishes, and the contemnor has to be released." *Shillitani v. United States,* 384 U.S. 364, 371–72, 86 S.Ct. 1531, 1536, 16 L.Ed.2d 622 (1966).

Many scholars of the law and private attorneys will see the Court as espousing a new rule of law that a retrial after the declaration of a mistrial is but a mere continuation of the first trial. It is a bold move, but does little to enhance jurisprudence as a science—if there be any thought of holding to that goal. The real question is whether evidence may be *coerced* from a defendant after the close of his first trial for possible use in a second trial. Nay, I say, a thousand times nay. When the first trial ended and the jury was discharged, it was over and not subject to reopening. At a second trial a new jury could be called to retry the

issues, but in all respects it would be a second trial—not a continuation of the first. It is at that point I side with the *Yates* court and part with present company in this case.

At the second trial the defendant may decide to not take the stand and stand on his right to do so with some confidence that the State will neither attempt to put him on the stand nor comment on his silence. The trial court was entirely without any power to attempt coercive methods to make the defendant reveal long after the first trial that which he declined to answer at the first trial on the grounds that it might incriminate him. In essence, what we have here is a well-intentioned trial judge using his coercive powers to compel discovery so that the prosecutor would thereby have advance knowledge of the defendant's testimony in the event the defendant did take the stand at his second trial.

It is important to take close note of the post-trial discovery process which led to the defendant's incarceration and the delay of his trial:

> "THE COURT: ... [I]f the Defendant persists in refusing to answer these questions I have directed him to answer, then the Court will have no recourse but to vacate that trial setting by reason of the action and refusal of the Defendant and if he's denied a speedy retrial of this case, it will be because of his own choosing.
>
> "Now, as I said, I will give the Defendant an opportunity to answer these questions by the Prosecuting Attorney at this time so I can determine *in advance of this trial setting whether he will comply or will not.*
>
> "I am not going to leave this trial setting for the 16th and call in jurors on the 16th day of October knowing in advance that the Defendant would refuse to answer these questions.
>
> "Now, of course, *he's under no obligation to testify in a retrial, but these matters that are pertinent to his first trial, they are matters that have not been resolved and this is the time I consider to do that.*

> ....
>
> "THE COURT: All right. Before I rule on this, I'd like to ask the State, for the record, whether they are prepared to proceed with the trial of Mr. Talmage, the retrial of Mr. Talmage, with the present state of the case as it now appears. In other words, are you willing to proceed without having the information that you sought to obtain by your questioning on cross examination?
>
> "MR. ALBERS: Your Honor, *we could proceed without the information.* We would certainly prefer to have it. We proceeded last time without it. It's not a question that we cannot—We'd certainly be best to the State to have that information to check out that story and investigate those matters. *We could retry it—It would be like any other evidence that for one reason or another can't come in.* We feel we are entitled to it.
>
> "THE COURT: Well, let's put it this way: If you are in a position of wanting to proceed with the retrial without the information, the Court would permit the trial setting to stand. If you are not willing to proceed, I am prepared to—*what I am prepared to do is to commit Mr. Talmage to the custody of the Sheriff until he complies with the directive of the Court to answer these questions. If it appears he has not changed his mind a week prior to the trial setting, I would vacate that trial setting at that time so that we would not have a jury brought in needlessly on the 16th day of October* and that is how I would proceed.
>
> "MR. ALBERS: With that option, Your Honor, I would then request the Court to require that information be made available. It would certainly be helpful in checking into the credibility of that story." (Emphasis added.)

The trial court's errors are self-evident. It tried to procure testimony after the close of a trial which could never be reopened and which could have no effect on that trial. It imprisoned a man not for punishment for his refusal to testify at the first trial (which I concede that it could do) but

to ascertain what he would say if he did testify at the second trial, even though acknowledging at the same time that "he's under no obligation to testify in a retrial." Third, and possibly the most egregious holding made and affirmed at this level is the use of contempt power for discovery purposes. Our criminal justice system does not countenance the imprisonment of an accused defendant in order to obtain discovery which the Court thinks should be available to the prosecution. In short, there has been a denial of due process.

The defendant was improperly confined in an attempt to make him give pre-trial testimony. The state clearly ratified and acquiesced in the procedure. Hence, it was the state, not the defendant, which held the key to defendant's right to a speedy trial. The confinement of Talmage was unlawful, and the delay of trial occasioned thereby cannot serve as a defense for the failure to respect defendant's right to a speedy trial.

### III. *YATES* REMEDY OF APPEAL NOT AVAILABLE IN IDAHO

A distinction between this case and *Yates* is that although in both cases the trial court utilized coercive confinement to obtain defendant's testimony, the *Yates* case proceeded to trial and Yates, along with other defendants, was convicted. The other defendants were allowed bail and released, but Yates continued to be held. When first jailed for refusing to answer on cross-examination while the trial went ahead, Yates immediately filed notice of appeal. When, *after* she was convicted of conspiracy and alone denied bail, a second order was entered continuing her confinement pursuant to the first order of contempt which contained the provision that she would remain imprisoned until she answered the question which had been put to her. She also appealed the second order. The Circuit Court of Appeals upheld the first order, as would have I, but held "it was error to attempt to coerce this witness into testifying before a

jury which had been disbanded and could not be legally recalled." *Yates,* 227 F.2d at 848.

A singular distinction between *Yates* and this case is that an order holding a person in contempt is not appealable under I.C. § 7–614,[1] *Parker v. Parker,* 97 Idaho 209, 541 P.2d 1177 (1975); *Glenn Dale Ranches, Inc. v. Shaub,* 95 Idaho 853, 522 P.2d 61 (1974); *Barnett v. Reed,* 93 Idaho 319, 460 P.2d 744 (1969)—which apparently is not the rule in the federal system. Only by wholly ignoring *Yates* can the Court today uphold the trial court's ruling that it would not proceed with a second trial nor free Talmage from his coercive confinement until he would answer questions and thereby furnish evidence which could be used against him at a second trial if he were to take the stand. Moreover, and another proposition of law into which I have no time to delve, is the probable use the prosecutor might make of such coerced testimony at a second trial even if Talmage did not take the stand. Having once done so in the criminal prosecution against him, I would not be surprised to find some authority holding that his former testimony—whether at his first trial, or given after it in order to gain release from confinement—might be allowed into evidence.

### IV. DENIAL OF THE RIGHT TO A SPEEDY TRIAL WAS COERCIVE, IRRESPECTIVE OF THE COERCIVE INCARCERATION

The point to keep in mind in weighing my views against those found or implied in the Court's opinion is that the confinement of Talmage was coercive in *two* respects:

(1) He would not be freed until he agreed to answer the questions, but would be confined indefinitely, and

(2) He would not be accorded his right to a speedy (second) trial until he complied with the trial court's order that he answer the questions.

---

1. "The judgment and orders of the court or judge, made in cases of contempt, are final and conclusive." I.C. § 7–614.

The issue before us today is, of course, the second. It is properly before us because, other than for the trial court's unlawful and erroneous order, the defendant would have had his second trial close upon the heels of the first, and that issue would never have arisen. The Court's opinion speaks in terms of the delay between the first and second trial being caused by "the defendant's willful disobedience of the trial court's order to answer certain questions," but declares that the delay so occasioned "should not be weighed against the state." This is difficult to accept. Having mentioned above that although the procedure elected was of the court's making the state ratified and acquiesced therein, it is perhaps well to point to that specific portion of the transcript which makes the court's statement excusing the state entirely untenable:

"THE COURT: ... I am prepared to give you another opportunity to answer those questions under oath that the Prosecutor might put to you concerning your direct testimony in your trial and if you refuse to answer any questions that the Court deems to be relevant to your testimony on direct examination or reasonably connected with that testimony, I would consider it to be a contempt of court and I'd be prepared to take certain action.

"Now, that action could be that I could commit you to jail until such time as you decide you will answer the questions put to you. In this way you would be committed there until those answers were made or until you decided that you would answer. If you should later decide that you would answer those questions and did do so, you would be released from this type of a commitment to jail.

"Now, you may say, well, I am already in jail. So what?

"*The time that you would spend in jail because of this refusal to answer would not count toward any sentence that you might otherwise receive in this case,* so the effect of this would be that once these proceedings are done with here, the time that—you'd not get any credit for this time. In other words, you are just going to be sitting there.

. . . .

"MR. LONGETEIG: ... So before we announce any intentions what we are going to do in the future to the Court, we'd ask the Court to reconsider the original matter.

. . . .

"THE COURT: Well, the Court is not going to change its opinion about the refusal to answer previously. I am satisfied that the Defendant properly was required to answer that question put to him and that the waiver—that he had waived his Fifth Amendment right. What the Defendant is trying to do is to, of course, protect himself in both places at the expense of a fair and complete and honest disclosure of the facts. Based upon the result in the Cartwright case and the result in the Defendant's own trial raised a serious question as to the believeability of the Defendant's story. Obviously in those two trials, twenty-three out of twenty-four jurors did not believe the Defendant's story.

"MR. LONGETEIG: I would object, Your Honor, to any consideration of such a matter. Until this man's convicted by a full jury, he is entitled to the presumption of innocence, so I just don't think that is even proper to consider at this point.

"THE COURT: Well, this is what goes to this Court's statement that because of this refusal the jury has not had an opportunity in either one of these cases to fully see the evidence that properly should have come into the trial and to fully test this Defendant's testimony in each of those trials.

"Now, as far as the Defendant's not being given a speedy trial, a speedy retrial of this case, *the Court is prepared, of course, to set this matter down and have set this matter down for trial on the 16th day of October.* But if the Defendant persists in refusing to answer these questions I have directed him to answer, then the Court will have no recourse but to vacate that trial setting by reason of the

action and refusal of the Defendant and if he's denied a speedy retrial of this case, it will be because of his own choosing.

"Now, as I said, I will give the Defendant an opportunity to answer these questions by the Prosecuting Attorney at this time so I can determine in advance of this trial setting whether he will comply or will not.

"I am not going to leave this trial setting for the 16th and call in jurors on the 16th day of October knowing in advance that the Defendant would refuse to answer these questions.

"Now, of course, he's under no obligation to testify in a retrial, but these are matters that are pertinent to his first trial, they are matters that have not been resolved and this is the time I consider to do that.

"Now, Mr. Talmage, knowing that—what the Court's position on this is, do you choose to—Is it still your position that you would refuse to answer, here and now today, the questions that the Court might direct you to answer regarding the testimony that you gave at your own trial?

"THE DEFENDANT: I need—I'd like to have a few minutes to talk to Mr. Longeteig.

"THE COURT: All right. We will take a recess so you will have that opportunity. Mr. Longeteig, let me know when you are ready to resume the hearing.

"MR. LONGETEIG: Yeah.

. . . .

"THE COURT: All right. Mr. Longeteig, you have had a chance to talk to Mr. Talmage now.

"MR. LONGETEIG: That's correct, Your Honor, and without lending any disrespect to this Court, Mr. Talmage is still—does not want to answer that question for the reasons previously stated and therefore would respective—respectfully decline to do so."

Following which the court offered the prosecutor the option of going to trial or not, as set forth previously in Part II, after which the following took place:

"THE COURT: Mr. Talmage, let me ask you directly then: Do you at this time refuse to answer the questions, the particular question that I read to you this morning or questions that might be related to your direct examination at your last trial? Will you now refuse to answer those questions?

"MR. TALMAGE: Yes, sir, Your Honor, I would have to.

"THE COURT: *All right. Based upon that refusal then, the Court finds you in contempt of court. I will sentence you to the custody of the Sheriff until you have—you comply with the directive of the Court to answer those questions.*"

As I have gone to great pains to point out, it is clear from the foregoing that the defendant was not ordered to be incarcerated for not answering questions at the first trial, but rather for refusing to answer the same questions when propounded to him by the court at the hearing which took place on September 25, long after the first trial had been terminated by the court's declaration of a mistrial. If such is not clear enough, I point also to the order of the trial court which recites that "the court thereupon found the defendant to be in contempt of court and sentenced him to the custody of the Idaho County Sheriff until he indicates his willingness to answer the questions." R. 51. If that be thought insufficient, I point to the court's letter of April 2, 1979, wherein it is made absolute that defendant was not at any time incarcerated for his refusal to testify at the first trial when he voluntarily took the stand:

"The Court believes that the defendant may still be subject to the penalties of criminal contempt under § 18–1801(6) Idaho Code, for his refusal as a witness to answer questions in the Cartwright trial on September 13th, 1978, *and for his subsequent refusal to answer questions in his own trial on September 15th, 1978.* If convicted, it would appear that defendant could be sentenced to up to six months in jail on each count. I see nothing in the records of these cases or in the Court's

Civil Contempt Order that would prevent the prosecuting attorney from filing such criminal contempt charges, if he chooses to do so. If this is done, the charges would be heard by some other judge of this court.

"In the event that defendant testifies at his re-trial in a similar manner, and refuses to answer questions when ordered to do so, it will be the Court's intention to treat the matter as a criminal contempt under § 18–1801(6) Idaho Code. It will also be the Court's intention to strike any of the defendant's testimony concerning a subject about which he refuses to answer questions on cross examination, when ordered to answer such questions, and the jury will be instructed appropriately to disregard that particular testimony of defendant." R. 68–69.

It is beyond cavil that defendant's incarceration was not just for the coercive purpose of providing testimony for a second trial, but to delay a second trial until defendant capitulated, and that the prosecutor, although conceding he could have gone to trial on October 16th, elected to make use of the option being offered him by the court at the defendant's expense. Where, as noted by the court in the excerpt above from the September 25th hearing, eleven of the jurors at the first trial were voting to convict defendant at the time of their rather precipitate discharge,[2] there was little if any need to delay the second trial, as the prosecutor seemed to realize.

### V. AN ANOMALY REARS ITS UGLY HEAD

Not mentioned in the Court's opinion is that the trial court, as he had intimated he would do, on Talmage's second trial, and conviction, did deny him credit for jail time from September 25, 1978 (date of the post-trial hearing), to April 6, 1979 (date on which the court terminated his order for coercive contempt).

In June of 1982, Talmage from the confines of the penitentiary filed in this Court a petition for an original writ of habeas corpus, the essence of which was that if he had been given credit for his jail time, he would be eligible for release. In a well-written supporting brief he relied extensively upon *Yates:*

"The trial court's imposition of coercive incarceration, eleven days following that same court's declaration of a mistrial, and for the purpose of inducing the defendant to answer questions propounded on cross-examination during the prior trial is contrary to the holding in *Yates v. United States,* 227 F.2d 844, Ninth Circuit, (1955):

" 'It was improper for trial court, after termination of criminal prosecution, to order defendant committed in coercive restraint for contempt for failure to answer questions propounded in cross-examination.' *Id.* at 845.

"In *Yates,* supra, the court while recognizing that the importance to the government of the defendant answering the questions raised on cross-examination, still refused to recognize the unconstitutionality of coercive restraint after the close of the main trial.

"The issue before this court differs from *Yates,* only in that the Petitioner herein was subjected to coercive restraint following a mistrial where the contempt occurred. However, we ask that this court note the following salient points regarding that difference:

"That by legal definition, a mistrial is a nullity:

" 'In legal effect a mistrial is equivalent to no trial at all, and is declared because of some circumstance indicating that justice may not be done if the

---

**2.** One can reasonably surmise that had the jury been requested to resume deliberations at normal working hours on the following day, the recalcitrant juror very well might have yielded to the other eleven, and the cost of another trial thus have been avoided. In a way the case is somewhat like *State v. Silcox, supra,* wherein my separate opinion I suggested that the state may have been the loser when the jury was exhorted at a late hour. Much as the trial court in Talmage's case somehow learned of the 11 to 1 jury count in that case, so has word reached me that it was indeed the state who lost in *Silcox.*

trial continues.' See C.J.S. Vol. 58, Mistrial, p. 834.

"Even more important, we think, is that the holding in *Yates,* supra, is predicated to a large degree upon the discharge of the jury; thereby effecting the continual duty to the sworn oath taken, and the ability of the contemptor to purge the contempt:

" 'It is probable that the force of the oath which she took in that proceeding had been extinguished by the discharge of the jury.' See *Yates v. United States* at 847.

"Further, while it is widely recognized that opinions are not rendered in footnotes; it is worthy to note the *Yates court's remarks;*

" 'No case has been cited to us indicating that the duty of a witness to answer even in a civil case extends beyond the discharge of the jury in a particular case.' See *Yates,* at 847, n. 5." Petitioner's Brief in Support of Petition for Writ of Habeas Corpus, Sup.Ct. No. 14631.

Responsive thereto we issued the alternative writ,[3] and thereafter the respondent, Darrol Gardner, Warden, responded that the petitioner had been released. Anomalous, then is the inexplicable stance which the Court today takes in steadfastly refusing to acknowledge that Talmage was denied his constitutional right to a speedy trial.

### VI. CLOSING

In closing, other than that he received a felony conviction obtained in violation of his rights, Talmage, now having served his time for that conviction, and having been given credit for jail time and now released, probably will search no further for the relief denied him here. This Court, for all practical purposes, is the court of last resort. If it seems that I have written at length, it is not for this defendant, but in the hope that other trial judges in other cases will pause to reflect before using the Court's opinion as precedent for such an improper procedure as the Court approves today. As a last word of advice, *Yates* was not a little case which comes out of obscurity to fill the needs of this particular defendant. It was a big case, big enough to cause the United States Supreme Court to grant certiorari. I commend the reading of the opinions of both the Ninth Circuit Court of Appeals and the United States Supreme Court, 355 U.S. 66, 78 S.Ct. 128, 2 L.Ed.2d 95 (1957). "[I]mprisonment cannot be used to coerce evidence after a trial has terminated ...." *Id.* at 72, 78 S.Ct. at 132.

Since writing the foregoing, the Court's opinion has been expanded by a revision of footnote 3 therein. The footnote strangely enough is really the only place that the Court's opinion makes any attempt to meet the main thrust of defendant's appeal and to meet the main theme of that which I have written in a futile attempt to dissuade the other members of the Court from issuing an opinion which most trial lawyers of experience will see as setting extremely bad precedent.

When defendant, *and his counsel,* were following the trial confronted by a district judge bent on providing the prosecution with responses to previously unanswered questions, the attorney for defendant displayed extreme courage in advising his client, the defendant, that he need not answer. Not only did the defendant face contempt, as the trial court clearly threatened,

---

**3.** "It appearing from a verified Petition presented to this Court that you have in your custody the above named Petitioner, SYD U. TALMAGE; and the Court having reviewed said Petition and finding that it shows prima facie good cause for the issuance of a Writ of Habeas Corpus commanding you to release the Petitioner upon the basis that he has, after being credited with all applicable pretrial confinement, served his sentence under which he is in your custody.

"NOW, THEREFORE, YOU ARE HEREBY ORDERED AND COMMANDED upon the service of this Order upon you to release the Petitioner from your custody, or show cause, if any you have, by the filing of an Answer in this Court to the Petition herein on or before September 10, 1982, at five o'clock p.m., why you should not be permanently and absolutely commanded by a Writ of Habeas Corpus to release the Petitioner from your custody."

but the attorney may have well wondered whether he, too, might find himself jailed based on the trial court's notions of obstructing justice where a district court has ordered something to be done. The courage which the attorney here displayed is that type of steadfastness and loyalty to a client which makes for a strong trial bar. The attorney did not believe his client was obliged to incriminate himself, and both stood their ground. Fortunately for the attorney, it was only the defendant who was jailed until he would obey what the court obviously considered to be a lawful order. The attorney did not so believe.

Footnote 3 of the Court's opinion attempts to overcome the *Yates* case by attributing to it a holding which the case does not contain, i.e., that there is a difference between a trial which terminates by a verdict and a trial which terminates by a mistrial, thus materially unsettling what appears to be rather forthright statements of law in *Yates*. Worse, however, the Court's opinion attempts to defend an indefensible position by declaring that "[d]isobedience of the trial court's order was contemptuous, regardless of the correctness of that order," and cites the Idaho cases of *Barnett v. Reed,* 93 Idaho 319, 460 P.2d 744 (1969) and *Mathison v. Felton,* 90 Idaho 87, 408 P.2d 457 (1965). Here the author of the opinion does a disservice to the science of jurisprudence. Both of these cases bear no relation whatever to the issue presented here— which has to do not with the correctness of the order, but with its lawfulness, i.e., did the court act in excess of and beyond its *jurisdiction?* Error was not ever thought to be an issue on the appeal until it was injected into the footnote.

Much time has already been devoted toward fulfilling my obligation as part of a collegiate court to work toward the fulfillment of justice and the promotion of jurisprudence as a science. To scholars and members of the trial bar I will leave the reading of *Barnett v. Reed* and *Mathison v. Felton,* and the holdings therein which I totally accept. With but little extra effort, however, I will set forth that which the Court in *Barnett* saw as its holding in the *Mathison* case:

"If the court has jurisdiction of the parties, the subject matter *and the authority or power to make the order it did,* the disobedience of such order constitutes contempt, regardless of whether the order disobeyed was correct or incorrect. *Mathison v. Felton,* supra; 12 A.L.R.2d 1059, at 1107, § 41." 93 Idaho at 321, 460 P.2d at 746.

At stake in that case was the witness's refusal to answer a question based upon the witness's interpretation of a statute which had never before been interpreted. Such is a far cry from the instant case, where surely it can be said that any trial attorney on obtaining his license has to know that one day he may have to and will advise his client that an unlawful order beyond the court's jurisdiction to make cannot form the basis of a contempt conviction for refusing to obey. As was stated in *State v. McNichols,* 62 Idaho 616, 115 P.2d 104 (1941), and has always been the law in Idaho, and all other jurisdictions with which I have had any contact or exposure:

"Violation of an order which is void because of lack of jurisdiction of the court to make it is not contempt of court, and no one is under compulsion to obey it." 62 Idaho at 624, 115 P.2d at 108.